294 F.2d 36
 Leslie TAYLOR and Kevin Taylor, minors, by Wilbert Taylor and Hallie Taylor, their parents and next friends, et al., Plaintiffs-Appellees,
v.
BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF the CITY OF NEW ROCHELLE and Herbert C. Clish, as Superintendent of Schools of the City School District of the City of New Rochelle, Defendants-Appellants.
 No. 427.
 Docket 27055.
 United States Court of Appeals Second Circuit.
 Argued July 18, 1961.
 Decided August 2, 1961.
 
 Constance Baker Motley, New York City (Thurgood Marshall and Paul Zuber, New York City, on the brief), for plaintiffs-appellees.
 Julius Weiss, of Weiss & Bronston, New York City (Murray C. Fuerst, New Rochelle, N. Y., on the brief), for defendants-appellants.
 Jack M. Perlman, New York City, for Seth M. Glickenhaus, Nolan M. Fallahay, and Marylyn W. Pierce, applicants for intervention.
 Burke Marshall, Asst. Atty. Gen., Harold H. Greene and Isabel L. Blair, Attys., Dept. of Justice, Washington, D. C., and Robert M. Morgenthau, U. S. Atty., S. D. N. Y., New York City, for United States as amicus curiae, for affirmance.
 Edwin J. Lukas, Leo Pfeffer, Arnold Forster, Simon Rosenzweig, New York City, and Arthur L. Pulley, New Rochelle, N. Y. (Theodore Leskes, Sol Rabkin, and Joseph B. Robison, New York City, of counsel), for American Jewish Committee, American Jewish Congress, Anti-Defamation League of B'nai B'rith, Catholic Interracial Counsel of New Rochelle, and Urban League of Westchester County, amici curiae, for affirmance.
 Bernard T. McGivern, Albany, N. Y., for New York State School Boards Assn., as amicus curiae, for reversal.
 Before CLARK, MOORE, and SMITH, Circuit Judges.
 CLARK, Circuit Judge.
 
 
 1
 This is a class action brought by eleven Negro children through their parents, on behalf of all Negro children situated in the Lincoln Elementary School District in New Rochelle, New York. Plaintiffs seek principally a permanent injunction enjoining the defendants, the Board of Education and the Superintendent of Schools of the New Rochelle City School District, from requiring them to be registered in a racially segregated public elementary school and requiring the defendants to register them in a public elementary school that is racially integrated. After an extensive trial the District Court, per Kaufman, J., on January 24, 1961, wrote a detailed opinion, reported in D.C.S.D.N.Y., 191 F.Supp. 181, making findings of fact and conclusions of law supporting the plaintiffs' case and directing the defendant Board to present to the court on or before April 14, 1961, a plan for desegregation to begin no later than the start of the 1961-62 school year. Reference is made to this opinion for a detailed statement of the facts here relevant.
 
 
 2
 The defendants took an appeal, which this court, by divided vote, dismissed as premature. Taylor v. Board of Education, etc., 2 Cir., 288 F.2d 600. Thereafter proceedings were had below resulting in an opinion and decree of May 31, 1961, D.C.S.D.N.Y., 195 F.Supp. 231, which directed the defendants to allow students in the Lincoln Elementary School (the school here in issue) to transfer to other elementary schools within New Rochelle. To comply with the court's directive the defendants had submitted with reluctance a plan for such transfers under conditions which the court found unduly burdensome. So the court in accepting the plan rejected all conditions — other than those of detail as to the time and manner of application — except two, viz., that parents must provide any necessary transportation at their own expense and that there must be available school space for the transferees. It is from this decree — further details of which are noted hereinafter — that the present appeal is taken.
 
 
 3
 A major finding of the court below was that the defendant School Board had deliberately created and maintained Lincoln School as a racially segregated school. This crucial finding is, we conclude, supported by the record. Thus, around 1930, an area of several blocks, occupied by whites, was carved out of the Lincoln District and added to the Daniel Webster District, even though this area was adjacent to the Lincoln School and was a relatively long distance from the Webster School. When Negroes later moved into this area it was restored to the Lincoln District. In addition, children from the predominantly white Rochelle Park within the Lincoln District were removed from that district and assigned to the Mayflower School. It also appears that until 1949 the Board allowed white children within the Lincoln District to transfer to other schools, with the result that Lincoln School in 1949 was 100 per cent Negro. The defendants sharply attack the testimonial evidence received on this issue; but the basic facts just recited, which appear incontrovertible, support the finding and leave as the vital problem the later conduct of the Board and its present responsibility for the conditions stimulated prior to 1949.
 
 
 4
 On January 11, 1949, the Board adopted a policy of refusing further transfers and of admitting new students only to the school of the district in which they reside. This policy of attendance at the school of the district of residence, the "neighborhood school policy" or NSP, had been in existence for some time, but with the amelioration provided by the system of permissive transfers; henceforth it was to be applied with complete rigor. While it did mean that a small number of white children were retained in the district, yet it served to fix the Lincoln School as a segregated one, so that it is now 94 per cent Negro. At the same time that the Board settled its policy in 1949, it promised a study of district lines with a view to setting up school districts in terms of the best interests of all the children and of the most complete utilization of the present physical plant; and thereafter it caused several surveys to be made by its own school personnel or others. One of the most complete was that made by a professorial team from Teachers College, Columbia, and the School of Education of New York University, resulting in December 1957 in the Dodson Report, so called from its Director, Professor Dan W. Dodson, a specialist in the field who testified for the plaintiffs below. This report, whose official title was "Racial Imbalance in Public Education in New Rochelle, New York," was a most comprehensive statement of the problem and an admonition to the Board to make a broadly based attack upon the evil of segregation, with specific recommendations more extensive and drastic than those in the decree under appeal. See D.C.S.D.N.Y., 191 F. Supp. 181, 188-190.
 
 
 5
 Major recommendations of the Dodson Report included proposals for the rebuilding of a larger Lincoln School on the same site, with the discontinuance of nearby Washington School, together with extensive redistricting and a more flexible use of NSP in the future. But the Board took no action other than to propose rebuilding the Lincoln School on its present site, which in the light of the Board's policy of refusal to allow children to transfer to schools in other districts would mean a freezing in of segregation at Lincoln. The proposal, once defeated, was, however, eventually carried by referendum vote of the New Rochelle voters in May 1960; and the imminence of plans for the rebuilding of Lincoln precipitated this class action instituted in October and brought to trial in November 1960.
 
 
 6
 It must be acknowledged that the problems facing the Board, while not peculiar to this community, are serious and difficult. They arise when people of a single racial group tend to settle in a particular neighborhood such as the Lincoln District here, and the trend is accelerated by housing developments and real estate transactions increasing the group numbers. Even so, the action of public bodies, of which school boards are most potent because of the importance of public education in American life, must be in accordance with the constitutional standards as expounded by the Supreme Court.[1] The facts recited above showing the Board's acceleration of segregation at Lincoln up to 1949 and its actions since then amounting only to a perpetuation and a freezing in of this condition negate the argument that the present situation in Lincoln School is only the "chance" or "inevitable" result of applying a neighborhood school policy to a community where residential patterns show a racial imbalance. Rather they make it appear that the Board considered Lincoln as the "Negro" school and that district lines were drawn and retained so as to perpetuate this condition. In short, race was made the basis for school districting, with the purpose and effect of producing a substantially segregated school. This conduct clearly violates the Fourteenth Amendment and the Supreme Court decision in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180. See Clemons v. Board of Education of Hillsboro, Ohio, 6 Cir., 228 F.2d 853, certiorari denied Board of Education of Hillsboro, Ohio v. Clemons, 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868; Holland v. Board of Public Instruction of Palm Beach County, Fla., 5 Cir., 258 F.2d 730.
 
 
 7
 So the present 94 per cent Negro enrollment at the Lincoln School goes beyond mere "racial imbalance," and approximates closely the harmful conditions condemned in the Brown case. Since these conditions were the result of the deliberate conduct of the Board, the plaintiffs and those similarly situated are entitled to some form of relief.[2]
 
 
 8
 The plan which the court eventually adopted is one noteworthy for its moderation. It is not one supported by the Dodson Report, but it appears to have been followed with at least fair success in other cities such as Baltimore. It can be put into operation with little administrative difficulty or public expense, as the Board showed in the submission of its own plan, which is the actual basis of the decree finally entered. Under this decree, students who would normally enroll at Lincoln School may apply for transfer to other elementary schools in New Rochelle. They may list at least four choices in order of preference, and are entitled to transfer to the same grade as they would attend at Lincoln, without any necessity of emotional or academic testing or approval. The parents of the students who elect to transfer are obligated to furnish transportation at their own expense; and the right to transfer is subject to the existence of room in the other schools, within the limits of the Board's present policy of maximum class size. We think this plan an eminently fair means of grappling with the situation, in accord with the principles stated in the Brown case. Doubtless it will not solve all problems, but it does call for a sincere attempt at recognition of the principle of desegregation in this community. The court's retention of jurisdiction to assure full compliance with the decree gives it also power to make or consider modifications as the need therefor may appear.
 
 
 9
 The decree must therefore be affirmed. On remand the district court, in view of the delay, will undoubtedly wish to set a later date for applications for transfer for the current school year. We see no occasion to grant a stay of the decree; the Board is called upon for no new public expenditures and will suffer no loss, while the school children will be prejudiced by what will soon be necessarily a year's delay at this crucial period in their education.[3]
 
 
 10
 Decree affirmed.
 
 
 
 Notes:
 
 
 [1]
 The Board makes much of a decision in its favor in an adversary proceeding brought by these plaintiffs before the State Commissioner of Education. But from the terms of the decision we are forced to conclude that that official did not feel himself subject to the constitutional constraint to the same extent as we do
 
 
 [2]
 Under the circumstances we need not examine the interesting issue how far a public body may save itself from constitutional constraint by mere inaction
 
 
 [3]
 The petition to intervene presented by Seth M. Glickenhaus et al., the three minority and dissenting members of the nine-member Board, is denied, since the point they wish to make, that the appeal here was not authorized by official Board action, appears not to be well taken. Of course their general stand in favor of more affirmative action against school segregation accords with the decision here and in the court below
 
 
 
 11
 MOORE, Circuit Judge (dissenting).
 
 
 12
 I cannot agree with the opinion of the trial court or that of my colleagues. The defendants have lost and, absent some further review, they and the school children of New Rochelle must conform to the views of a Federal court. However, beneath a banner emblazoned with the words "constitutional rights" and "segregation", is a decision which in its far-reaching implications, in my opinion, may seriously affect the school systems of this country. Our future is closely linked to our educational program. But more closely connected with our heritage are such concepts as individual freedom, democratic elective processes, States' rights and equal protection of our laws for all. Too easy is it to march behind a banner bearing such slogans. History records that the populace, singing and cheering, once marched behind a certain gigantic horse of wood. It seemed harmless enough at the time. History has a way of repeating itself. Would that my Cassandra-like pessimism may prove to be ill-founded. It is doubtful in any event that her warnings ever saved any one or any nation. I do not claim to have the answer to the problem of racial imbalance throughout the world or even the school problem in New Rochelle. I merely would venture the thought that there may be many different answers and solutions, possibly many unsolvable cases and that these problems should be left to the judgment and discretion of the communities involved, provided, of course, that such judgment be exercised without discrimination in civil rights because of race, color, creed or religion.
 
 
 13
 Eleven Negro children by their parents in late 1960 filed their complaint (on their own behalf and on behalf of all other Negro children similarly situated) against The Board of Education of The City School District of the City of New Rochelle (the Board) and Herbert C. Clish, as Superintendent of Schools of The City School District of the City of New Rochelle (the Superintendent) as defendants. They allege that the proceeding is "for a permanent injunction enjoining the Defendants from requiring the Plaintiffs to be registered in a racially segregated public elementary school" and affirmatively "requiring them to register the said Plaintiffs in a public elementary school that is racially integrated." The relief sought is that the Court enter a decree:
 
 
 14
 A. Declaring the application and continuation of the "neighborhood school" policy in New Rochelle to be illegal and unconstitutional and a violation of the due process and equal protection clauses of the Fourteenth Amendment;[1]
 
 
 15
 B. Enjoining defendants from requiring plaintiffs and others of their class to attend a racially segregated public elementary school;
 
 
 16
 C. Requiring defendants to register plaintiffs and others in a racially integrated school; and
 
 
 17
 D. Enjoining defendants from constructing a school in a location that will render it racially segregated "if the Defendants continue to operate the public schools in the City of New Rochelle on a `neighborhood school' policy."
 
 
 18
 Despite a modern tendency to regard pleadings as old-fashioned — and hence of little value — only by such allegations can the issues be ascertained and defendants advised of the charges against them (parenthetically, also a constitutional right). The complaint is broad in its sociological concepts. It recognizes that "in many cities of New York State, and elsewhere, ghettos exist." Into these ghettos minority racial groups are crowded. As a result thereof, the public schools in such neighborhoods in such cities are segregated, reflecting the segregated pattern of the neighborhood." The conclusion is reached that "so long as the Defendants adhere to this `neighborhood school' policy in the City of New Rochelle, segregated schools will exist there."
 
 
 19
 Reading some of the more specific charges, the complaint alleges that:
 
 
 20
 1. there are public elementary schools in New Rochelle "attended only by white children";
 
 
 21
 2. there is a school "attended only by Negro children";
 
 
 22
 3. the educational background of the teachers in the allegedly segregated school is inferior;
 
 
 23
 4. the curriculum in the allegedly segregated school is inferior to the allegedly all-white school;
 
 
 24
 5. the operation of a "neighborhood school" policy and defendants' refusal to cease such operation violates the rights of plaintiffs and others under the Fourteenth Amendment.
 
 
 25
 A trial ensued. Over 2,000 pages of testimony were taken, scores of exhibits were introduced. The history of the school problems before the Boards of Education, the city fathers and the people of New Rochelle from 1930 on was put upon the record after a fashion by school board members, past and present, school principals, P.T.A. members, "experts" in the field of education, by reports from the experts which usually, as might be expected, differed radically each from the other, protagonists for one side or the other and the customary amount of hearsay, opinion and speculation always attendant to the task of solving the unsolvable. Conclusions, the "hall mark" of experts' opinions, ranged from "In large measure the problem is not one of race relation, but of differences in socioeconomic status of one segment of the community as compared with the other" to "No presently known techniques can now create complete integration of the Lincoln School district, one of these three, and still retain educational values." Various witnesses gave their views as to what constituted segregated schools in their own minds. The percentages sufficient to so characterize a school varied from 50% to 80%.
 
 
 26
 The best account of the problems presented to the Board during the last ten years (1950-1960) is found in the testimony of Kenneth B. Low who from 1950 to 1960 served on the Board and was its President from 1958 to 1960. He had had a distinguished career in the field of interracial relations and for seven years had served as Chairman of the Westchester County Council appointed by the State Commission Against Discrimination. In answer to the trial court's suggestion that there might be "some solution by changing the district line," namely, by cutting "into Mayflower and Webster and Washington," he points out that the "Dodson" recommendation would result in a 71% Negro student population. This the court thought would be "a step in the right direction"; Mr. Low was of the belief that it would be "a start in the wrong direction." "Solutions," he said, which sent "youngsters out of the district because of their race," as discussed before the Board, brought about "discrimination in reverse because you are creating special conditions for people on account of their race and that it could and perhaps should apply equally to other schools which had either a racial imbalance or a religious imbalance or an imbalance of national backgrounds, and the result is that it would establish a precedent for sending children, because of any of these factors, to schools, which was believed to be a violation of basic principle." (One school was over 90% Jewish and one over 90% Italian.) "But [said Mr. Low] I am not going to violate what I consider to be basic constitutional principles, and the mere fact that this [Lincoln] happens to be a badly imbalanced racial school is not due to any act of the Board of Education. It is a residential condition."
 
 
 The Issues
 
 
 27
 The relief sought was a permanent injunction. Of necessity an injunction must operate presently and prospectively. It should be granted or denied in the light of existing conditions and not upon practices or regulations no longer in effect.[2] Yet vast amounts of testimony were taken concerning the situation from 1930 to 1949 and from 1949 to 1960.
 
 
 28
 Quite apart from the conflict in the opinions of various witnesses, certain salient facts are undisputed.
 
 
 29
 1. The Board is authorized by Article 51 of the New York Education Law, McKinney's Consol.Laws, c. 16 to administer the School District and constitutes an incorporated municipality (N.Y. Ed.Law, Sec. 2502, subd. 1). The Board "shall have in all respects the superintendence, management and control of the educational affairs of the district, and, therefore, shall have all the powers reasonably necessary to exercise powers granted expressly or by implication * * *" (Sec. 2503).
 
 
 30
 2. Amongst other powers, the Board is authorized to "determine the school where each pupil shall attend," select sites for school buildings and to exercise its judgment as to the need of any district for a new building (Secs. 2503, subd. 4, par. d, 2512, subds. 2, 4).
 
 
 31
 3. New Rochelle now has twelve school districts, and long prior to 1930 has had school districts, in each of which is located a public elementary school. As of October, 1960, 6,732 children attended these schools.
 
 
 32
 4. For many years the Board has followed a neighborhood school policy. The factors which enter into the decision to maintain schools in various residential areas of the city include accessibility to the home (walking distance being important where young children 5 to 11 years of age are involved), traffic and safety problems, and recreational and community facilities afforded to neighborhoods by the school buildings.
 
 
 33
 5. In drawing any district lines, there must be some contiguity between districts.
 
 
 34
 6. The present Lincoln School building built in 1898 is antiquated.
 
 
 35
 7. The decision of the Board to replace it was made after a consideration of the many problems presented, including financial and tax problems after an exercise of judgment and after a referendum to the people on the question.
 
 
 36
 8. New Rochelle does not now have and never has had a school from which Negro children were excluded. Segregation, as the term is popularly used in the various decisions on the subject, has never existed in the school system of the city.
 
 
 37
 9. During the last 30 years a large number of Negro families have moved into the area in which the Lincoln School is located.
 
 
 38
 10. In 1949 the Board cancelled a permissive transfer plan because it had a tendency to promote racial imbalance. Since that date all children have had to attend the school within the district of their residence.
 
 
 The Opinion of January 24, 1961
 
 
 39
 In its opinion (191 F.Supp. 181, 198) the trial court, in effect, turned the case from a segregated school case into an integration case. This turn was required because there was no proof whatsoever of segregation; there was proof of racial imbalance in various sections of the city. Brown v. Board of Education of Topeka, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, a true segregation case, was used as the principal reason for ordering the Board to present "a plan for desegregation." Since there was no segregation, obviously there could be no desegregation.
 
 
 40
 The Board appealed. This court held the appeal to be premature and dismissed it, saying, however, that "this dismissal involves no intimation on our part with respect to the propriety or impropriety of the determination of the District Court," but that "the balance of advantage lies in withholding such review until the proceedings in the District Court are completed." This court made it perfectly clear that all rights were protected "if the finding of liability were ultimately to be annulled." (288 F.2d 600, 606.) And so the proceeding continued.
 
 
 41
 Protesting that "since the school system of New Rochelle is not operated on a `segregated' basis it is impossible to submit a plan which will put an end to segregation" and that the "command to alter the `racial imbalance' is too vague a standard," the "Board perplexed as to what racial mix meets the requirement of the Fourteenth Amendment" under protest and "in response to the Court's order" submitted a plan which is "neither the choice of the Board nor is its adoption recommended." A minority plan was also filed by three members of the Board. Objections were filed by plaintiffs and the trial court thereafter entered its decree of May 31, 1961.
 
 
 42
 Upon this appeal this court is charged with the duty of reviewing (1) the trial court's decision of January 24, 1961, and (2) its decree of May 31, 1961.
 
 
 The Decision of January 24, 1961
 
 
 43
 First must be considered whether plaintiffs have established a case that the schools of New Rochelle are being operated on such a segregated basis in the year 1961 that desegregation is called for under the doctrine of Brown v. Board of Education of Topeka.
 
 
 44
 Upon the trial plaintiffs failed to establish every factual element necessary to sustain a charge of segregation. There were no "all white" schools. There were no "all Negro" schools. There were no statutes, rules, regulations or policies denying admission of Negro children to schools attended by whites. The trial court focused its attention primarily on certain events from 1930 to 1949 and from 1949 to 1960 as proof of a purposeful scheme on the part of the Board to turn Lincoln into a segregated school.
 
 
 45
 The trial court's decision that the Board violated the Fourteenth Amendment is based on two conclusions both of which individually or together were considered sufficient to make out unconstitutional discrimination. The first (I) is "that the Board * * *, prior to 1949, intentionally created Lincoln School as a racially segregated school, and has not, since then, acted in good faith to implement desegregation as required by the Fourteenth Amendment." The second (II) is "that the conduct of the Board of Education ever since 1949 has been motivated by the purposeful desire of maintaining the Lincoln School as a racially segregated school."
 
 
 46
 * Before turning to the factual basis for the first conclusion, a few general propositions which limit the inquiry to be made when action by a State is challenged as denying equal protection of the laws should be stated. As the Supreme Court held in Lindsley v. Natural Carbonic Gas Co., 1911, 220 U.S. 61, 78-79, 31 S.Ct. 337, 340, 55 L.Ed. 369:
 
 
 47
 "1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary.
 
 
 48
 "2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary."
 
 
 49
 Accord, e. g., McGowan v. State of Maryland, 1961, 81 S.Ct. 1101, 1153, 1218, 6 L.Ed.2d 393. And it is generally the rule that the courts "cannot undertake a search for motive in testing constitutionality." Daniel v. Family Security Life Ins. Co., 1949, 336 U.S. 220, 224, 69 S.Ct. 550, 552, 93 L.Ed. 632. It is true that motive is not entirely irrelevant in determining whether action by State administrative officials constitutes unconstitutional discrimination. The discrimination, however, must be intentional or purposeful. A "discriminatory purpose is not presumed * * *; there must be a showing of clear and intentional discrimination." Snowden v. Hughes, 1944, 321 U.S. 1, 64 S.Ct. 397, 401, 88 L.Ed. 497.
 
 
 50
 Judged by these standards, can it be said that the present racial imbalance existing in the Lincoln School was clearly created by purposeful and intentional discrimination by the Board? It is an undisputed fact the Lincoln School was built in 1898 — long before any of the alleged discrimination is claimed to have occurred, and before there was a substantial Negro population living in the Lincoln neighborhood. Thus, the original selection of the site for Lincoln was not, and could not have been, motivated by a desire to create a segregated school. Next, the record discloses that the Board chose to operate, and has for decades operated, the elementary school system pursuant to a neighborhood school policy under which the city is divided into districts determined by considerations of proximity to the school, safety and school size. And there is no dispute that a plan which classifies students solely on the basis of where they live is, on its face, eminently reasonable and constitutional. Thus, there being nothing illegal in the location of the Lincoln School or in the choice of plans used to allocate students among the various schools, the illegality found by the trial court must of necessity have resulted from the application and administration of this concededly valid plan. Looking at the boundary lines of the Lincoln School district, there cannot be found "an uncouth twenty-eight-sided figure" (see Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 126, 5 L.Ed. 2d 110) nor two separate zones located in opposite ends of the city (see Clemons v. Board of Education of Hillsboro, Ohio, 6 Cir., 1956, 228 F.2d 853) nor even anything suggesting abnormal or irregular zoning. On the contrary, the Lincoln School lies in the center of a compact district, which, with the exception of a few slight contours, is basically a non-elongated rectangle. Each of the 12 elementary school districts is served by a centrally located school, and in none of the schools is there an all-white or all-Negro enrollment.[3] Moreover, it is also undisputed that the neighborhood school policy is presently strictly adhered to so that white students living in the Lincoln district are not allowed to attend other public elementary schools and Negro students living outside of this district are not permitted or required to attend Lincoln.
 
 
 51
 The classification used by the Board being reasonable and being administered reasonably and uniformly, further inquiry might well stop at this point because motives of the Board or past boards are irrelevant. Nevertheless, further pursuit reveals nothing in the record supporting the conclusion that the present situation at the Lincoln School is the result of purposeful discrimination by the Board. In so concluding, the trial court relied heavily on its finding that the Lincoln School district was "gerrymandered" in 1930, and that thereafter the lines were changed so as to contain the Negroes as the population expanded. Specifically, it was found that "the boundary lines between Webster and Lincoln were so drawn that, in one section, they were extended to a point directly across the street from Lincoln School"; that this line was moved westward to contain the population expansion of Negroes in the district, and that during the same period, alterations were being made between the Lincoln district and the Mayflower district.
 
 
 52
 Accepting the fact that the district lines were so moved in this period, this alone does not amount to gerrymandering, unless it be shown that the redistricting was done for the purpose of, and resulted in, the exclusion of white children and the inclusion of Negro children. The proof as to both purpose and effect is fatally defective. No facts were produced to show the racial composition of Lincoln district either before or after the supposed "gerrymandering." In fact, the only testimony relevant to the issue of "gerrymandering" was that of a Mrs. Bertha White, who stated that the redistricting corresponded to Negro population changes. Mrs. White had no first hand knowledge of the situation in 1930; nor did she supply facts and figures as to the racial balance existing at the periods when the lines were changed. Her conclusions were based exclusively on conversations "with children who went to school in 1929 and 1930, who had younger brothers and sisters who went to the school." It is claimed that this hearsay, or perhaps more accurately, double or even triple hearsay, is corroborated by a letter written in 1949 by Kenneth B. Low, former member of the Board. This letter states that "in 1930 the board participated in creating an overbalance of negro pupils in Lincoln School which steadily increased with the development of the neighborhood * *" This statement cannot possibly corroborate Mrs. White's testimony or be relevant to purposeful discrimination in 1930. No one disputes the fact that as an incident of the neighborhood school policy a racially overbalanced school has resulted but to show an unconstitutional discrimination it must at least be proven that this overbalance was created intentionally and purposefully, and as to the existence or nonexistence of this fact, Mr. Low's letter adds nothing.
 
 
 53
 This point, however, need not be belabored since the evidence demonstrates to an almost mathematical certainty that the present "racial imbalance" in the Lincoln school could not have resulted from this alleged "gerrymandering." Had the boundary lines between Lincoln and Webster not been so drawn in 1930 "that, in one section, they were extended to a point directly across the street from the Lincoln School," but instead had been drawn so that the Lincoln School was in the center of its district, the racial balance would have been no different today because the present district lines are now drawn as plaintiffs presumably claim they should have been drawn in 1930. Or had the Board not moved the district lines westward as the Negro population expanded in that direction, again it is clear that the Lincoln School today would still be predominantly Negro — in fact, the school being situated as it is in the center of the Negro area of the city, it is highly probable that the racial balance would be even more one-sided than it presently is.
 
 
 54
 What then caused the present "imbalance" in the Lincoln School? The undisputed facts reveal that since 1930 the Negro population in New Rochelle has increased by more than 50 per cent and that the Lincoln School lies in the center of the predominantly Negro area. Because of this heavy concentration and in view of the limited capacity of the Lincoln School, there is virtually no dispute that it would be impossible to draw district lines which would materially alter the present racial imbalance. The conclusion is thus inescapable that the population movement over the years has completely vitiated the effects of any supposed "gerrymandering" in the 1930's.
 
 
 55
 Similarly, the Board's pre-1949 transfer policy is completely irrelevant in respect to the situation as it exists in 1961. The discriminatory application of this policy may have resulted in the denial of equal protection of the law to Negro children attending Lincoln prior to 1949 and have contributed to the imbalance as it existed in 1949. However, with the passage of twelve years, this court can take judicial notice that the students affected by this policy have progressed beyond the elementary school level. Thus, with the elimination of the permissive transfer policy in 1949, its effects now have entirely disappeared.
 
 
 56
 The concept of causation pervaded the law long before the adoption of the Fourteenth Amendment or even the United States Constitution. In order to obtain relief from an injury which allegedly results from unconstitutional State action, it is necessary to show both that the State has acted unconstitutionally and that this action caused the injury of which the plaintiff complains. The plaintiffs' case here is defective on both these requirements.
 
 II
 
 57
 The first basis for the decision below being erroneous, the decision must stand or fall on the trial court's conclusion "that the Board of Education even since 1949 has been motivated by the purposeful desire of maintaining the Lincoln School as a racially segregated school," and that this behavior violated the Fourteenth Amendment.
 
 
 58
 As the trial court properly noted, "Constitutional rights are determined by realities, not by labels or semantics." Thus, in order to appreciate fully the significance of the decision and to determine exactly what is meant by "purposeful desire of maintaining * * * a * * * segregated school," a close analysis of the opinion is necessary. The opinion states that if the illegal motive is present, "it makes no meaningful difference whether the segregation involved is maintained directly through formal separation, or indirectly, through overrigid adherence to artifically created boundary lines, as in the present case * * * [and] [s]imilarly, it is of no moment whether the segregation is labelled by the defendant as `de jure' or `de facto', as long as the Board, by its conduct, is responsible for its maintenance" (191 F.Supp. 181, 194). In a footnote, "de jure" is defined as "segregation created or maintained by official act, regardless of its form," and "de facto" is defined as segregation resulting from fortuitous residential patterns. (Id., footnote 12.) The minor premise is then supplied by the finding that "the inference is inescapable that the Board's deliberate intransigence and inflexibility for the last eleven years in the face of public pressures and expert advice were motivated by a desire to continue Lincoln School as a racially segregated school, and thus not to alter the racial balance in the city's other elementary schools" (Id., At page 195), and that the Board by its "arbitrary rejection of all proposals for change has purposefully maintained Lincoln as a segregated school." (Id., At page 197.)
 
 
 59
 As previously mentioned, the present racial imbalance at Lincoln did not result and could not possibly have resulted from purposeful conduct (of which there was no convincing proof) by the Board. Moreover, in determining the legal import of the opinion, there must be excluded the finding that the boundary lines of the Lincoln district are artificial because a mere glance at the school district map of New Rochelle refutes this view, as does the undisputed expert testimony that, given the size and location of Lincoln, the lines could not be redrawn so as to materially change the present racial imbalance. Finally, the opinion must be viewed in the light of the entrenched rule of law that only "State action of a particular character * * * is prohibited * * * by the fourteenth amendment" (e. g., Civil Rights Cases, 1883, 109 U.S. 3, 11, 3 S.Ct. 18, 27 L.Ed. 835); that the "Amendment erects no shield against merely private conduct, however discriminatory or wrongful" (Shelley v. Kraemer, 1948, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161), and that thus if State action did not purposefully create the present racial imbalance at Lincoln, the Constitution would not place an affirmative duty on the Board to desegregate. "The equal protection and due process clauses of the fourteenth amendment do not affirmatively command integration * * *" (Borders v. Rippy, 5 Cir., 1957, 247 F.2d 268, 271); "The Constitution in other words, does not require integration. It merely forbids discrimination * * *" (Briggs v. Elliott, D.C.E.D.S.C.1955, 132 F.Supp. 776, 777).[4]
 
 
 60
 Viewed in this factual and legal context, what then is the rule of law laid down by the court below? The trial court has held in effect that when racial imbalance not attributable to unconstitutional State action is present in a public school, the State or its agencies, although not being required to change the situation, cannot refuse to act if the refusal is motivated by purposeful desire to maintain the condition. In short, the court has extended the Constitution to the point where motives for State non-action are now relevant. But does not the mere statement of this rule, stripped of its semantic gloss, carry its own refutation? If an existing law or its administration does not violate the Constitution, and if the State is not denying equal protection of the laws by not changing this law, by what alchemy does a refusal to change on the ground of an "illegal motive" turn this non-action into unequal protection of the law? Law is not a state of mind; it is an objective, though perhaps elusive and everchanging, phenomenon.
 
 
 61
 Rarely are motives for official action subject to inquiry (e. g., Daniel V. Family Security Life Ins. Co., supra; Wilkinson v. United States, 1961, 365 U.S. 399, 412, 81 S.Ct. 567, 5 L.Ed.2d 633). At least when a State acts affirmatively, a change in the status quo results, and from this change the courts can glean insights into the underlying purpose of the official action. But by what criteria can we judge why men refuse to act when they have no duty to act? Take, for example, the trial court's finding as to the Board's motive for its "intransigence and inflexibility for the last eleven years." This conclusion is supposedly supported by the Board's refusal to adopt a number of plans for changing the Lincoln situation submitted by various experts in school planning.[5] The Dodson Report, for instance, called for:
 
 
 62
 "1) The rebuilding of a larger Lincoln School on the same site;
 
 
 63
 "2) The discontinuance of Washington School;[6]
 
 
 64
 "3) Extensive redistricting; and
 
 
 65
 "4) The more flexible use of the neighborhood school policy in the future."
 
 
 66
 A decision to discontinue Washington School and to rebuild Lincoln School or to make any other decision which would affect the school system of the entire city called for the exercise of judgment in the light of existing conditions. It is doubtful that there is "a confident solution for problems as intractable as the frictions attributable to differences of race, color or religion." Beauharnais v. People of State of Illinois, 1952, 343 U.S. 250, 262, 72 S.Ct. 725, 733, 96 L. Ed. 919. Which of the many divergent suggestions of the many experts was the best in the light of other factors which had to be considered? One member of the Board might have been influenced by the costs involved; another by the waste in tearing down an existing school; another might have acted out of sheer inertia; and another might have acted honestly and in the exercise of sound judgment. This latter situation is the only conclusion supported by the facts in the record. Even viewed in a looking glass, any presumption of guilt unless innocence is clearly established has been rebutted. When a decision is intimately connected with local policy and involves matters in which judges have no "expertise" but only "opinions" how can they decide (1) whether a plan should have been adopted and (2) whether its rejection was based on "illegal motives"?
 
 
 67
 The only affirmative action by the Board was the decision to build a new Lincoln School on the site of old Lincoln. This decision might have been unconstitutional only if it were made for the purpose of creating a segregated school. In view of the Board's rejection of other plans for the specific reason that they would tend to worsen the racial imbalance in New Rochelle, a finding of illegal motive could not be supported, even were it material. Their judgment supported by a city referendum is that the Lincoln district needs a new school; that a new building may well improve the character of the neighborhood; and that mergers of certain districts are not advisable. Why should the Federal courts believe that their crystal ball is of better quality than that of the Board? Moreover, what is the relevance of a new Lincoln to old Lincoln? The decision below is predicated upon the theory that the Board unconstitutionally created and maintained old Lincoln; this theory has no basis in fact. Even assuming, therefore, that the decision to build a new Lincoln might have been unconstitutional (which in my opinion it was not), this would not change the fact that as to old Lincoln the Board has not acted unconstitutionally.
 
 
 68
 Although it should not be necessary, it is worthy of note that the Constitution does not declare what is desirable or undesirable (see, e. g., Daniel v. Family Security Life Ins. Co., supra); nor should judges confound "private notions with constitutional requirements." (American Federation of Labor v. American Sash & Door Co., 1949, 335 U.S. 538, 556, 69 S.Ct. 258, 260, 267, 93 L.Ed. 222 (concurring opinion, Frankfurter, J.).) Racial imbalance, as it exists in many of our cities and suburbs, presents a serious problem. And yet, I find nothing in the record which makes a racial imbalance a violation of our Constitution.
 
 
 The Decree of May 31, 1961
 
 
 69
 Concerned that the majority of the Board should manifest a "continuation of their attitude of arrogance" by their assertion of their constitutional right to claim that "no constitutional rights have been violated" and their adherence to their opinions as to the law instead of recognizing it to be as the trial court declared it, the court, although conceding that it could not "divine every possible eventuality which may arise in the future," decided that "the device of permissive transfers will afford the Negro children in the Lincoln district their constitutional rights." This is the same "device" which until abandoned by the Board in 1949 plaintiffs claim created Lincoln as an all Negro school. Furthermore, if this device does not "assure complete relief" to the court's satisfaction, it announces its availability "to consider other methods" — an assurance of continued court operated schools for the future.
 
 
 70
 But what will be the effect of this device? The court's decree provides that "any child of elementary school age residing in the Lincoln Elementary School District shall be permitted to register and enroll in any other public elementary school in the New Rochelle Public School System, in accordance with the provisions of this decree." (Emphasis supplied.) The Board is required to distribute to the parents "of all children," expected to be enrolled in Lincoln, transfer application forms. Applicants are to list four schools in preferential order to which transfer is desired. The Board is shorn of any discretion "to impose any standard of academic achievement or emotional adjustment as a requirement for transfers" and shall retain each pupil so transferred "until the completion of his elementary education." The transfer privilege must be permanent; otherwise the present condition will revert. If a substantial majority of the present student body at Lincoln plans to avail itself of this privilege, what shall become of the teachers already hired for the coming year? If in 1962, all the students decide to transfer, will Lincoln then have to be closed? But what if five years later a substantial number of students decide not to transfer? Presumably the trial court's Plan implicitly recognizes the right not to transfer. The Board would then be required to remove Lincoln from its mothball fleet, return it to active duty, and re-stock it with teachers, janitors, and supplies.
 
 
 71
 Under this decree the 29 white children (Board statistics, Exh. N) would have the same right to transfer as the 454 non-white children. Assuming a repetition of the effect of the pre-1949 permissive transfer policy, probably a large percentage of the 29 whites would apply. Since the Board could not constitutionally discriminate between races the result would be (as in pre-1949 days) to increase the percentage of Negro children in Lincoln. Thus, for example, were 20 white children and 80 Negro children transferred, the percentage of Negro children would increase from 94% to approximately 98%.
 
 
 72
 The court's decree is clear. It reads "any child." There cannot be any significance to the court's deletion of the words "without regard to race, creed, color or national origin" from a somewhat similar provision in the Board's proposed plan. Although the court may override the judgment and discretion of the Board, surely it did not intend to nullify the Constitutions of the United States and the State of New York.
 
 
 73
 The "equal protection" rights of all the other school children of New Rochelle are completely disregarded. How can a permissive transfer policy be granted only to one out of twelve districts? Why should the Negro child in Mayflower, Columbus or Washington be deprived of the privileges granted to the Lincoln district? If concentration of any one group is "segregation" (and hence a constitutional violation), why should not the Jewish or Italian child be given equal privileges to transfer? If, as represented, Columbus is in a depressed economic area and over 90% Italian, is not the proper education of a child as important to a resident of the Columbus district as the Lincoln district?
 
 
 74
 Regardless of protestations to the contrary, the effect and implications of the decision below are to place the operation of the schools of the country in the hands of the Federal courts or a single judge. His personal views as to those pupils who should be granted or denied transfer will control; he alone will decide what racial mixtures satisfy his concept of integration. Of necessity he will have to pass upon district lines if he chooses to permit neighborhood schools to continue. His decrees will cause schools to be built, altered or abandoned. Attendant thereto might even be an indirect fixing of the city's school tax rate to accomplish his bidding.
 
 
 75
 There will be those who will charge that these suggested possibilities are gross exaggerations and that "It Can't Happen Here." But if Federal courts undertake the operation, directly or indirectly, of the public schools, what will be the end result? Recent history has noted other government operations originally justified because business improved and the trains ran on time. In short, I believe that the decree takes away from the people, their duly elected or appointed Boards of Education, and from the States themselves their right to decide by democratic processes upon the educational policies for their communities.
 
 
 76
 In expressing these views, I am not unmindful, after reviewing the segregation cases from Brown v. Board of Education of Topeka to date, that although "the responsibility for public education is primarily the concern of the States" that this responsibility "must be exercised consistently with federal constitutional requirements as they apply to state action." Cooper v. Aaron, 1958, 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L. Ed.2d 5, 19, and that "[T]he right of a student not to be segregated on racial grounds in schools so maintained is indeed so fundamental and pervasive that it is embraced in the concept of due process of law" (Id., 358 U.S. at page 19, 78 S.Ct. at page 1410). With these broad principles I am in complete accord. But the Constitution should not be a one-sided document. The comity which the judicial branch might well show towards the legislative and executive cannot be better stated than as expressed by Mr. Justice Frankfurter in McGowan v. State of Maryland, 81 S.Ct. 1153, 1188, 6 L.Ed. 2d 393, 455:
 
 
 77
 "Through what precise points in a field of many competing pressures a legislature might suitably have drawn its lines is not a question for judicial re-examination. It is enough to satisfy the Constitution that in drawing them the principle of reason has not been disregarded." The primary purpose of this action was to declare the neighborhood school policy unconstitutional because it resulted in racial imbalances in a school located in a predominantly Negro residential area. Discretion as to the drawing of district lines should be left to the various school Boards absent such unusual fact situations as existed in Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110; Clemons v. Board of Education of Hillsboro, Ohio, 6 Cir., 1956, 228 F.2d 853.
 
 
 78
 But little comment need be made upon the majority opinion. Its conclusions can be explained in part by the obvious factual misconceptions on which they are based. Thus they say that "On January 11, 1949, the Board adopted a policy of refusing further transfers and of admitting new students only to the school of the district in which they reside." Nowhere, however, does the opinion attempt to show how this pre-1949 policy or the 1930 redistricting has any relevance to the situation at Lincoln in 1961. It is said that since 1949 the Board's actions have led to "a perpetuation and a freezing in" of a segregated condition. But what do "perpetuation" and "freezing in" mean in the context of constitutional prohibitions? And has not the majority — just as did the trial court through its use of such words as "over-rigid adherence," "intransigence," "inflexibility," and "maintained" — introduced, sub silentio, a revolutionary concept of State non-action into the Fourteenth Amendment?
 
 
 79
 In my opinion, the majority neither support nor condemn the neighborhood school policy but place their stamp of approval on the trial court's particular permissive transfer policy. Anomalously enough this very "permissive transfer policy," eliminated in 1949 to preserve a true "neighborhood school policy" so that the schools would accurately reflect the residential character of the neighborhood, is now acclaimed as the solution for the Lincoln School.
 
 
 80
 Affirmance of the trial court's plan is said to be "in accord with the principles stated in the Brown case." The Brown case can be searched in vain for its denials of equal protection, for discriminatory favors bestowed upon one group to the exclusion of others and for any mandate, direct or implied, that the Federal courts should take over the supervision and operation of the school systems throughout the United States. If this is to be its construction of its Brown decision that court should make it. Any extension as is now being made by the trial court and the majority here far beyond the bounds of Brown, should at least be premised upon some strong indication that the Supreme Court not only was decreeing non-segregation of white and Negro but also was decreeing enforced integration and compulsory racial mixtures according to Federal court formula in every city and hamlet of the country. Such thoughts should not be read into the decisions — or even into the minds — of others lightly.
 
 
 81
 There being no proof sufficient to sustain the allegations of the complaint, I would reverse and dismiss.
 
 
 82
 As to the decree of May 31, 1961, it denies, in my opinion, equal protection of the laws and is in derogation of the rights of the people of New Rochelle not to be subjected to discrimination because of race, color, creed, religion or national origin. I realize that, just as my views that pleadings still have a place and function in the law are exceedingly old-fashioned, my belief that the Constitution should apply equally to all our residents may be subject to the same criticism.
 
 
 83
 Because of the importance of this case to the people of New Rochelle and their Board of Education, I would grant a stay of the decree herein for 30 days to give the defendants an opportunity for such further appellate review as may be available to them in the event they decide to seek such relief.
 
 
 
 Notes:
 
 
 [1]
 United States Constitution, Fourteenth Amendment, Section 1
 
 
 [2]
 See e. g. United States v. Prince Ltd., 1917, 242 U.S. 537, 37 S.Ct. 233, 61 L. Ed. 479; Lewis Publishing Co. v. Wyman, 1913, 228 U.S. 610, 33 S.Ct. 599, 57 L. Ed. 989; Dinsmore v. Southern Express Co., 1901, 183 U.S. 115, 22 S.Ct. 45, 46 L.Ed. 111
 
 
 [3]
 For example, Trinity and Jefferson Schools — located in predominantly white neighborhoods — have 5 per cent and 7 per cent Negro enrollments, respectively; Washington, Mayflower and Webster — all contiguous to the Lincoln district — have over 50 per cent, and approximately 30 and 30 per cent, respectively, Negro enrollment
 
 
 [4]
 See also Henry v. Godsell, D.C.E.D.Mich. 1958, 165 F.Supp. 87, 90: "The fact that in a given area a school is populated almost exclusively by the children of a given race is not of itself evidence of discrimination." Accord, Sealy v. Dept. of Public Instruction of Pa., 3 Cir., 1958, 252 F.2d 898, certiorari denied 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1149. The plan that was finally approved in the historic Brown case provides for an all Negro school in an all Negro neighborhood. The three judge District Court there stated: "If it is a fact, as we understand it is, with respect to Buchanan School that the district is inhabited entirely by colored students, no violation of any constitutional right results because they are compelled to attend the school in the district in which they live." Brown v. Board of Education of Topeka, D.C.Kan.1955, 139 F.Supp. 468, 470. Both the judge below and plaintiffs' trial counsel praised the City of Washington, D. C., as a model of integration. The Superintendent of Schools of that city reports that in 1960, after five years of desegregation, 11 out of 60 schools in the system were all Negro; and in 43 schools the white enrollment is less than 10 per cent
 
 
 [5]
 The Board had reports from Dodson, Englehardt, Johnson and the decision of the Commissioner of Education of the State of New York after a plenary hearing in a proceeding brought by three of the plaintiffs herein on their own behalf and all others similarly situated attacking the school zones and the decision to build a new Lincoln School on the site of the present school. The Commissioner in part held:
 "The issue here before me is not whether some other arrangements may constitute a better solution. The issue, as pointed out heretofore, is whether the Board, after all its investigations and surveys, has been arbitrary in coming to the conclusion it did. Upon the record before me, I cannot find the action of the respondent Board, in determining to replace the Lincoln School with a modern structure and up-to-date facilities, constituted a reversible abuse of discretion" (Ex. K, p. 6).
 
 
 [6]
 Were Lincoln and Washington combined (assuming such a plan to be geographically feasible — an assumption of doubtful validity), such a district would still have approximately 80% Negro enrollment