247 F.2d 268
 Hilda Ruth BORDERS, a minor, by her father and next friend,
Louis Borders, Jr., et al., Appellants,
v.
Dr. Edwin L. RIPPY, as President of the Board of Trustees of
the Dallas Independent School District, et al., Appellees.
 No. 16483.
 United States Court of Appeals Fifth Circuit.
 July 23, 1957.
Rehearing Denied Aug. 27, 1957.
 
 Thurgood Marshall, New York, N.Y., and U. Simpson Tate, W. J. Durham, J. L. Turner, Jr., C. B. Bunkley Jr., and Louis Bedford, Dallas, Texas, Robert L. Carter, New York City, for appellants.
 A. J. Thuss, Dallas, Tex., for appellees.
 Before RIVES, JONES and BROWN, Circuit Judges.
 RIVES, Circuit Judge.
 
 
 1
 Twenty-eight Negro children appeal again to this Court from another judgment of the district court dismissing their complaint[1] in which they sought relief for themselves and other negroes similarly situated on account of their exclusion from certain public schools of Dallas solely because of their race or color.
 
 
 2
 The basic facts are simple and undisputed. Rosa Sims, ten years of age, and Maude Sims, nine, applied for admission to the John Henry Brown School, four blocks from their home. The school principal showed their father a directive from the School Board 'saying that no negro children could go to school with the whites,' and denied them the right to enter because they were Negroes. Instead, they went to Charles Rice Elementary School distant from their home 'about eighteen blocks across heavy traffic.' Like treatment from various public schools of Dallas was accorded to each of the other Negro children plaintiffs.
 
 
 3
 The testimony of the Assistant Superintendent and of the Superintendent of the Dallas Independent School District disclosed the steps which had been taken to comply with the school segregation decisions, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, decided on May 17, 1954, in which the final judgments were entered on May 31, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083. On July 13, 1955, the Board of Education made a statement of policy in which it instructed the Superintendent of Schools to proceed with a detailed study in the following areas:
 
 
 4
 '1. Scholastic boundaries of individual schools with relation to racial groups contained therein.
 
 
 5
 '2. Age grade distribution of pupils.
 
 
 6
 '3. Achievement and state of preparedness for grade level assignment of different pupils.
 
 
 7
 '4. Relative intelligence quotient scores.
 
 
 8
 '5. Adaptation of curriculum.
 
 
 9
 '6. The overall impact on individual pupils scholastically when all of the above items are considered.
 
 
 10
 '7. Appointment and assignment of principals.
 
 
 11
 '8. The relative degree of preparedness of white and negro teachers; their selection and assignment.
 
 
 12
 '9. Social life of the children within the school.
 
 
 13
 '10. The problems of integration of the Parent-Teachers Association and the Dads Club organization.
 
 
 14
 '11. The operation of the athletic program under an integrated system.
 
 
 15
 '12. Fair and equitable methods of putting into effect the decrees of the Supreme Court.'[2]
 
 
 16
 On July 27, 1955, the following was unanimously approved:
 
 
 17
 '* * * It was reported that this School System has been, is at present and will be obligated to continue an intensive study of the problems involved in 12 specific areas, and that reports would be made to the public of the results of these studies periodically.
 
 
 18
 'It will be impractical to attempt integration until these studies have been completed. Therefore, the Superintendent of Schools is hereby instructed that there shall be no alteration of the present status of the schools of this district in the term beginning September 1955.'
 
 
 19
 Nearly a year Later, on June 13, 1956, the Board issued its 'Second Statement on Desegregation by the President of the Board' concluding as follows:
 
 
 20
 'The Board recognizes its responsibility to implement the decree of the Supreme Court, but it reaffirms its studied opinion that it would be derelict in this regard if it ordered an alteration in the status of its schools until its understanding of the problems involved is as comprehensive as possible and its plans for such changes are completed. This Board feels that it cannot and should not in good conscience accept the responsibility for the manner which the decree of the Supreme Court is to be carried out until it has had sufficient time within which to formulate plans which must be to the best interests of this school district, its children, and the community. * * *
 
 
 21
 'Therefore, for the immediate future this Board feels that any change is premature and instructs the Superintendent of Schools to continue a segregated school system for the school year 1956-57.'
 
 
 22
 The Assistant Superintendent testified that there were about 119,000 children in the public schools of Dallas of which about 16 2/3 per cent, one out of every six, were Negroes. The Superintendent testified that immediate desegregation would result in mixed classes in all of the senior high schools with one possible exception, and in a large number of the elementary schools; that most of the school buildings are completely filled and white children would have to be displaced to let Negro children come in; that there is a difference in scholastic aptitudes of white children and Negro children, the average difference at the first grade level being one and one-half years, and the older the children the greater the gap, so that in high school senior classes it would run around three and one-half years; that, having that differential in mind, there were not enough teachers available to impart adequate instruction to both Negro children and white children; that no child is refused admission because he is retarded. He testified categorically that he was 'still continuing segregation based upon races in the Dallas Independent School District.'
 
 
 23
 The appellees insist that the judgment should be affirmed because of the failure of pleading or proof to show that each plaintiff has exhausted his administrative remedies, under Article 2654-7 of the Revised Civil Statutes of Texas, Vernon's Ann.Civ.St., by appeal to the State Commissioner of Education. Texas State law gave the Board and the Superintendent the power to act, and, in the exercise of such power, they denied the plaintiffs the right to attend public schools of their choice solely on account of their race or color. By such action the plaintiffs have been deprived of their constitutional rights, and they are not required to seek redress from any administrative body before applying to the courts. Bruce v. Stilwell, 5 Cir., 1953, 206 F.2d 554, 556; Carter v. School Board of Arlington County, Va., 4 Cir., 1950, 182 F.2d 531, 536; Bush v. Orleans Parish School Board, D.C.E.D.La.1956, 138 F.Supp. 337, 341, affirmed in Orleans Parish School Board v. Bush, 5 Cir., 1957, 242 F.2d 156, 162; see also Browder v. Gayle, D.C.M.D.Ala.1956, 142 F.Supp. 707, 713, affirmed per curiam 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed. 114.
 
 
 24
 Other applicable principles of law are equally simple and well understood. Overcrowding in public school rooms cannot be lawfully prevented or relieved by excluding pupils on the basis of their race or color. Clemons v. Board of Education of Hillsboro, Ohio, 6 Cir., 1956, 228 F.2d 853, 857.
 
 
 25
 The equal protection and due process clauses of the fourteenth amendment do not affirmatively command integration, but they do forbid any state action requiring segregation on account of their race or color of children in the public schools. Avery v. Wichita Falls Independent School District, 5 Cir., 1957, 241 F.2d 230, 233. Pupils may, of course, be separated according to their degree of advancement or retardation, their degree of to learn, on account of their health, or for any other legitimate reason, but each child is entitled to be treated as an individual without regard to his race or color.
 
 
 26
 So long as they are excluded from any public school of their choice solely because of their race or color the plaintiffs are being denied their constitutional rights. It is not a sufficient answer to say that the school board has made 'a prompt and reasonable start' and is proceeding to a 'good faith compliance at the earliest practicable date' with the May 17, 1954 ruling of the Supreme Court. The district court must retain jurisdiction to ascertain and to require actual good faith compliance. Brown v. Board of Education, 349 U.S. 294, 299, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083; Avery v. Wichita Falls Independent School District, 5 Cir., 1957, 241 F.2d 230, 235.
 
 
 27
 We do not impugn the good faith of the Board, of the Superintendent, or of any of the school authorities. Indeed, we note with appreciation the sincere statement of their counsel that '* * * it is to be hoped that the aftermath which occurred in Mansfield will not be similar in Dallas.' Faith by itself, however, without works, is not enough. There must be 'compliance at the earliest practicable date.' Brown v. Board of Education, 1955, 349 U.S. 294, 300, 75 S.Ct. 756; School Board of City of Charlottesville, Va. v. Allen, 4 Cir., 1956, 240 F.2d 59, 64; Willis v. Walker, D.C.W.D.Ky.1955, 136 F.Supp. 177, 181.
 
 
 28
 In their prayer on this appeal, appellants are moderate. They do not pray for any immediate or en masse desegregation, but, recognizing that still further time may be needed for the admittedly difficult problems to be solved even if they are approached in a spirit of good will on all sides, their prayer is:
 
 
 29
 'Wherefore, appellants pray that the judgment below be reversed and that the court below be instructed to enter an order requiring appellees to desegregate the schools under their jurisdiction 'with all deliberate speed."[3]
 
 
 30
 At least to that much they are certainly entitled, and it is so ordered and adjudged. See 28 U.S.C.A. 2106.
 
 
 31
 Reversed with directions.
 
 
 32
 On Petition for Rehearing.
 
 
 33
 PER CURIAM.
 
 
 34
 By petition for rehearing the appellees express their apprehension that, under the terms of an Act of the 1957 Texas Legislature approved by the Governor On the 23rd day of May, 1957, and to become effective on to-wit August 23, 1957,[4] their obedience to the order of the district court to be issued upon remand, pursuant to the directions of this Court, may result in the loss to the School District of some six million ($6,000,000.00) dollars a year of aid from the State of Texas and in the imposition by the State of penalties upon the persons carrying out such order. That Act, of course, cannot operate to relieve the members of this Court of their sworn duty to support the Constitution of the United States, the same duty which rests upon the members of the several state legislatures and all executive and judicial officers of the several states.[5] We cannot assume that that solemn sworn duty will be breached by any officer, state or federal. If, however, it should be, then the Board of Trustees of the School District and the persons carrying out the order to be issued by the district court are not without their legal remedies. The petition for rehearing is
 
 
 35
 Denied.
 
 
 
 [1]
 The first dismissal is reported in Bell v. Rippy, 133 F.Supp. 811, reversed by this Court, Brown v. Rippy, 233 F.2d 796. The second dismissal is reported in Bell v. Rippy, 146 F.Supp. 485
 
 
 [2]
 At the time of the trial on December 19, 1956, the study had been completed in the first five and in the eighth area
 
 
 [3]
 See the form of judgment in Bush v. Orleans Parish School Board, D.C.E.D.La.1956, 138 F.Supp. 337, 342, affirmed 5 Cir., 242 F.2d 156
 
 
 [1]
 Chapter 283 of the 1957 Texas Legislature, Vernon's Annotated Civil Statutes of Texas, Art. 2900a
 
 
 [2]
 'Clause 2. This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding
 'Clause 3. The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.' Constitution of the United States, Article VI.