285 F.2d 43
 Sandra Craig BOSON et al., Appellants,
v.
Dr. Edwin L. RIPPY, As President of the Board of Trustees of
the Dallas Independent School District, Dallas
County, Texas, et al., Appellees.
Dr. Edwin L. RIPPY, As President of the Board of Trustees of
the Dallas Independent School District, Dallas
County, Texas, et al., Appellants,
v.
Sandra Craig BOSON et al., appellees.
 No. 18467.
 United States Court of Appeals Fifth Circuit.
 Nov. 30, 1960, Supplemental Opinion Dec. 7, 1960, Rehearing
Denied Jan. 5, 1961.
 
 W. J. Durham, C. B. Bunkley, Jr., Dallas, Tex., Thurgood Marshall, New York City, Elwood H. Chisolm, New York City, of counsel, for appellants.
 Henry W. Strasburger, Mark Martin, Dallas, Tex., Royal H. Brin, Jr., Dallas, Tex., Strasburger, Price Kelton, Miller & Martin, Dallas, Tex., of counsel, for appellees-appellants, Dr. Edwin L. Rippy, and others.
 Before RIVES, Chief Judge, and TUTTLE and JONES, Circuit Judges.
 RIVES, Chief Judge.
 
 
 1
 This action seeking an end to enforced racial segregation in the public schools of the Dallas Independent School District was first dismissed without prejudice by the district court in September 1955.[1] This Court reversed with directions to afford the parties a full hearing.[2] The Supreme Court denied certiorari.[3]
 
 
 2
 After hearing the testimony, the district court again dismissed the action without prejudice.[4] This Court reversed with directions that the district court enter an order requiring the defendants to desegregate the schools under their jurisdiction 'with all deliberate speed.'[5]
 
 
 3
 The district court construed such directions to require immediate en masse desegregation, and, accordingly, against its own expressed better judgment, entered an order enjoining the defendants 'from requiring or permitting segregation of the races in any school under their supervision, beginning and not before the mid-Winter school term of 1957-58.' That order was again reversed by this Court with more specific directions to accord the school authorities 'a reasonable further opportunity promptly to meet their primary responsibility in the premises, and then if the plaintiffs, or others similarly situated, should claim that the school authorities have failed in any respect to perform their duty, there should be a full and fair hearing in which evidence may be offered by any and all parties, and further that the Court should retain jurisdiction to require compliance with its judgment.'[6]
 
 
 4
 The district court then entered a general order requiring desegregation 'with all deliberate speed.' No further court proceedings appear until some thirteen months later, when the plaintiffs filed their 'motion for further relief' praying for immediate desegregation of the public schools. The district court denied immediate desegregation, but retained jurisdiction and recessed the hearing from August 4, 1959, to the first Monday in April 1960. Upon appeal this Court modified the order of the district court 'so as to require the defendants to 'make a prompt and reasonable start toward full compliance' with its injunction order of April 16th, 1958, and to that end, within thirty days from the date on which the present judgment of this Court of Appeals becomes final, to submit a plan for effectuating a transition to a racially nondiscriminatory school system; and further that the District Court, within thirty days after the submission of such plan, hold a full hearing upon the plan so submitted and on any objections which may be filed thereto.'[7] In conformity with such an order, the defendant school authorities filed in the district court a twelve-year, 'stair-step' plan of desegregation starting with the first grade in September 1961, and proceeding by the desegregation of one additional grade a year until all twelve grades in all public schools have been desegregated.[8]
 
 
 5
 The district court disapproved this plan and required the defendants to file 'an alternate desegregation plan more in keeping with the Court's oral opinion.'[9] The alternate plan was promptly filed, providing for the separating and grouping of the schools into white, Negro and mixed schools, and for canvassing parents and pupils in order to learn 'who does and who does not want integration, and thereby give all concerned what they prefer, as far as is practical and possible.'[10]
 
 
 6
 The district court expressed the opinion that the holding of an election under Article 2900a of Vernon's Ann.Revised Civil Statutes of Texas should not be made a condition of a plan of desegregation, again rejected Plan No. 1, and ordered the defendants to amend Plan No. 2 by eliminating the paragraphs which make an election and favorable result conditions of the plan. In conformity with such opinion and order, the defendants re-submitted both plans amended so as not to depend upon the outcome of an election. The district court again rejected Plan No. 1, overruled the objections of the plaintiffs to Plan No. 2 as amended, and approved that plan. The plaintiffs appeal from the approval of Plan No. 2 as amended, and the defendants appeal from the disapproval of Plan No. 1 as amended.
 
 
 7
 We agree with the district court that the holding of an election under Article 2900a of the Revised Civil Statutes of Texas should not be made a condition of a plan of desegregation. It goes without saying that recognition and enforcement of constitutional rights cannot be made contingent upon the result of any election.[11]
 
 
 8
 Plan No. 2 as amended, which was approved by the district court, would continue the practice of enforced segregation in the all white and all Negro schools and would require the operation of mixed schools if parents and pupils of both races so desired. That plan evidences a total misconception of the nature of the constitutional rights asserted by the plaintiffs. Negro children have no constitutional right to the attendance of white children with them in the public schools. Their constitutional right to 'the equal protection of the laws' is the right to stand equal before the laws of the State; that is, to be treated simply as individuals without regard to race or color. The dissenting view of the elder Mr. Justice Harlan in Plessy v. Ferguson, 1895, 163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256, has been proved by history to express the true meaning of cour Constitution:
 
 
 9
 '* * * There is no caste here. Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved.'
 
 
 10
 Instead of removing the forbidden classification according to race or color, that plan adds another such classification. Virtually the same plan has already been condemned in the Southern District of Texas and by this Court. Houston Independent School District, et al. v. Ross, 5 Cir., 1960, 282 F.2d 95, 96. State support of schools in which segregation of the pupils is required by law cannot be squared with the constitutional command of equal protection of the laws. Cooper v. Aaron, 1958, 358 U.S. 1, 19, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19.[12] The district court's approval of Plan No. 2 as amended must be reversed.
 
 
 11
 As to Plan No. 1 as amended we are of the opinion that paragraph 6, quoted in the margin,[13] should be stricken because its provisions recognize race as an absolute ground for the transfer of students, and its application might tend to perpetuate racial discrimination. Compare Kelley v. Board of Education of City of Nashville, 1959, 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240.
 
 
 12
 The brief on behalf of the school authorities states: 'Plan No. 1 represents the first choice and best judgment of the School Board in exercising 'the primary responsibility for elucidating, assessing and solving' the 'varied local school problems,' placed upon local school authorities by the Supreme Court's opinion in the Brown case.' On the other hand, the appellants insist that the district court 'should have ordered the Dallas School authorities to admit appellants and all other Negroes similarly situated to public schools under their supervision on a racially nondiscriminatory basis at the start of the ensuing school term.' The appellants further pray-- and with much reason, in view of the frustrating history of this litigation-- that this Court should here render a definite judgment. We are reluctant to substitute our judgment for that of the district court, and are willing to do so only to the extent necessary to assure a prompt start toward full compliance and reasonable, even though conservative, progress toward bringing about the end of racial segregation in the public schools 'with all deliberate speed.' See Brown v. Board of Education, 1955, 349 U.S. 294, 299, 75 S.Ct. 753, 99 L.Ed. 1083. To that end we direct that the district court approve Plan No. 1 as amended, eliminating therefrom paragraph 6 quoted in footnote 13, supra.
 
 
 13
 In so directing, we do not mean to approve the twelve-year, stair-step plan 'insofar as it postpones full integration.' See Evans v. Ennis, 3 Cir., 1960, 281 F.2d 385, 389. The district court has not expressly passed on whether that much delay is necessary, or whether the speed is too deliberate. It retains jurisdiction of the action during the transition. See Kelley v. Board of Education of City of Nashville, supra; Aaron v. Cooper, 8 Cir., 1957, 243 F.2d 361, 364. After the approval of Plan No. 1 as amended, with the elimination of paragraph 6, the future orders of the district court should be governed by the rule so well stated in Brown v. Board of Education, 1955, 349 U.S. 294, 300, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083:
 
 
 14
 'The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public shools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system. During this period of transition, the courts will retain jurisdiction of these cases.'
 
 
 15
 Reversed and remanded with directions and for further proceedings.
 
 
 16
 'Supplemental Opinion.
 
 
 17
 Further consideration has persuaded us to elaborate upon that part of the opinion which reads:
 
 
 18
 'As to Plan No. 1 as amended, we are of the opinion that paragraph 6, quoted in the margin,[13] should be stricken because its provisions recognize race as an absolute ground for the transfer of students, and its application might tend to perpetuate racial discrimination. Compare Kelley v. Board of Education of City of Nashville, 1959, 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240. '13 '6. The following will be regarded as some of the valid conditions to support application for transfer:
 
 
 19
 "a. When a white student would otherwise be required to attend a school previously serving colored students only;
 
 
 20
 "b. When a colored student would otherwise be required to attend a school previously serving white students only;
 
 
 21
 "c. When a student would otherwise be required to attend a school where the majority of students in that school or in his or her grade are of a different race."
 
 
 22
 The case cited, while not authority, expresses the doubt of the Justices who thought that certiorari should be granted as to whether similar provisions of the Nashville plan are constitutionally invalid. We are so doubtful of the validity of the provisions of Paragraph 6 that we think they should not be included in the plan.
 
 
 23
 We fully recognize the practicality of the argument contained in the opinion of the Sixth Circuit holding that similar provisions are not unconstitutional. Kelley v. Board of Education of City of Nashville, 6 Cir., 1959, 270 F.2d 209, 228 229, 230. Indeed, this Court has adopted the reasoning in Briggs v. Elliott, D.C.E.D.S.C.1955, 132 F.Supp. 776, relied on by the Sixth Circuit,[14] and has further said:
 
 
 24
 'The equal protection and due process clauses of the fourteenth amendment do not affirmatively command integration, but they do forbid any state action requiring segregation on account of their race or color of children in the public schools. Avery v. Wichita Falls Independent School District, 5 Cir., 1957, 241 F.2d 230, 233. Pupils may, of course, be separated according to their degree of advancement or retardation, their ability to learn, on account of their health, or for any other legitimate reason, but each child is entitled to be treated as an individual without regard to his race or color.'
 
 
 25
 Borders v. Rippy, 5 Cir., 1957, 247 F.2d 268, 271.
 
 
 26
 Nevertheless, with deference to the views of the Sixth Circuit, it seems to us that classification according to race for purposes of transfer is hardly less unconstitutional than such classification for purposes of original assignment to a public school.
 
 
 27
 'Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. For that reason, legislative classification or discrimination based on race alone has often been held to be a denial of equal protection. Yick Wo v. Hopkins, 118 U.S. 256 (6 S.Ct. 1064, 30 L.Ed. 220); Yu Cong Eng v. Trinidad, 271 U.S. 200 (46 S.Ct. 619, 70 L.Ed. 1059); Hill v. Texas, 316 U.S. 400 (62 S.Ct. 1159, 86 L.Ed. 1559).'
 
 
 28
 Kiyoshi Hirabayashi v. United States, 1943, 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774.
 
 
 29
 The special provisions of the eliminated paragraph 6 are objectionable also on another score. They would apply a rule of law to the desegregated public schools of the Dallas School District different from that applicable to other public schools in the State of Texas. That paragraph would apparently deprive the Dallas Board of all discretion and place it under the absolute duty to transfer the pupil upon application when one of the 'valid conditions,' entirely racial, exists. On the other hand, under the law generally applicable, the Board has a wide discretion in transferring pupils from school to school. As was noted in Shuttlesworth v. Birmingham Board of Education, D.C.N.D.Ala.1958, 162 F.Supp. 372, 378, affirmed, 1958, 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145: 'By virtue of its authority to administer and supervise the public schools, the defendant Board might provide for the assignment of pupils to particular schools upon any reasonable and legitimate basis.' In the public schools of Texas generally, the subject of transfer is covered by the provisions of Article 2901a, Section 4, Vernon's Texas Civil Statutes:
 
 
 30
 'Sec. 4. Subject to appeal in the respect provided, each Local Board of School Trustees shall have full and final authority and responsibility for the assignment, transfer and continuance of all pupils among and within the public schools within its jurisdiction, and may prescribe rules and regulations pertaining to those functions. Subject to review by the Board as provided herein, the Board may exercise this responsibility directly or may delegate its authority to the Superintendent or other person or persons employed by the Board. In the assignment, transfer or continuance of pupils among and within the schools, or within the classroom and other facilities thereof, the following factors and the effect or results thereof shall be considered, with respect to the individual pupil, as well as other relevant matters: Available room and teaching capacity in the various schools; the availability of transportation facilities; the effect of the admission of new pupils upon established or proposed academic program; the suitability of established curricula for particular pupils; the adequacy of the pupil's academic preparation for admission to a particular school and curriculum; the scholastic aptitude and relative intelligence or mental energy or ability of the pupil; the psychological qualification of the pupil for the type of teaching and associations involved; the effect of admission of the pupil upon the academic progress of other students in a particular school or facility thereof; the effect of admission upon prevailing academic standards at a particular school; the psychological effect upon the pupil of attendance at a particular school; the possibility or threat of friction or disorder among pupils or others; the possibility of breaches of the peace or ill will or economic retaliation within the community; the home environpsychological relationships with other pupils and with teachers; the choice and interests of the pupil; the morals, conduct, health and personal standards of the pupil; the request or consent of parents or guardians and the reasons assigned therefor.
 
 
 31
 'In considering the factors and the effect or results thereof the Board or its agents shall not consider and shall not use as an element of its evaluation any matter relating to the national origin of the pupil or the pupil's ancestral language.
 
 
 32
 'Local Boards may require the assignment of pupils to any or all schools within their jurisdiction on the basis of sex, but assignments of pupils of the same sex among schools reserved for that sex shall be made in the light of the other factors herein set forth.'[15]
 
 
 33
 The eliminated Paragraph 6 seems to us to conflict with the Texas statute just quoted. Whether so or not, however, that Texas statute makes it clear that the eliminated Paragraph 6 is superfluous. The Board already had ample authority to transfer pupils from school to school upon any reasonable and legitimate basis. Of course, the elimination of Paragraph 6 in no way affects or detracts from that authority. To avoid any possible misunderstanding, however, it seems appropriate to call attention to the caveat emphasized by the Supreme Court in affirming the Shuttlesworth decision:
 
 
 34
 'All that has been said in this present opinion must be limited to the constitutionality of the law upon its face. The School Placement Law furnishes the legal machinery for an orderly administration of the public schools in a constitutional manner by the admission of qualified pupils upon a basis of individual merit without regard to their race or color. We must presume that it will be so administered. If not, in some future proceeding it is possible that it may be declared unconstitutional in its application. The responsibility rests primarily upon the local school boards, but ultimately upon all of the people of the State.'
 
 
 35
 Shuttlesworth v. Birmingham Board of Education, D.C.N.D.Ala.1958, 162 F.Supp. 372, 384, affirmed, 1958, 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145.
 
 
 36
 In view of this extension of the opinion, it is ordered that the mandate not issue until twenty-one (21) days from this date, and the time for filing any application for rehearing is extended accordingly.
 
 
 
 [1]
 Bell v. Rippy, D.C.N.D.Tex.1955, 133 F.Supp. 811
 
 
 [2]
 Brown v. Rippy, 5 Cir., 1956, 233 F.2d 796
 
 
 [3]
 Rippy v. Brown, 1956, 352 U.S. 878, 77 S.Ct. 99, 1 L.Ed.2d 79
 
 
 [4]
 Bell v. Rippy, D.C.N.D.Tex.1956, 146 F.Supp. 485
 
 
 [5]
 Borders v. Rippy, 5 Cir., 1957, 247 F.2d 268, 272
 
 
 [6]
 Rippy v. Borders, 5 Cir., 1957, 250 F.2d 690, 694
 
 
 [7]
 Boson v. Rippy, 5 Cir., 1960, 275 F.2d 850, 853
 
 
 [8]
 This will be referred to as Plan No. 1. It is essentially the same as the 'Nashville Plan' approved in Kelley v. Board of Education of City of Nashville, etc., 6 Cir., 1959, 270 F.2d 209, certiorari denied 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240
 
 
 [9]
 The district court's oral opinion included the following:
 'Some educator has advanced the following plan which has an appeal: That the school authorities set aside schools within the city limits in which all those of either race who desire integration may be enrolled by placement arrangement and transportation given to that school and that other like schools for different grades be set aside maybe elsewhere in the city. Since the children would be there together by their parents' consent there is at least one reason why good will would prevail in these schools that might not prevail in schools where children are brought together by force and without the approval of their sarents. without the approval of their parents. integrated schools would through the years follow, not more than 12 years.'
 
 
 [10]
 This will be referred to as Plan No. 2
 
 
 [11]
 See Borders v. Rippy, 5 Cir., 1957, 247 F.2d 268, 272, opinion on rehearing; Dallas Independent School District v. Edgar, 5 Cir., 1958, 255 F.2d 455; Houston Independent School District v. Ross, 5 Cir., 1960, 282 F.2d 95, approving opinion of the district court. We are further advised that the Attorney General of Texas has ruled that Article 2900a is not applicable where a school district desegregates pursuant to court order
 
 
 [12]
 A full discussion of a similar plan is contained in the opinion of Judge William E. Miller in Kelly v. Board of Education of City of Nashville, D.C.M.D. Tenn.1958, 159 F.Supp. 272, 278:
 '* * * It would sanction by law, if approved, the separation of schools in accordance with racial distinctions and once the schools were separated, Negro children because of their race alone would be excluded by operation of law from schools designated for while children only. The discrimination would not be removed simply by providing a third school or group of schools which could be attended by members of both the white and colored races. It is a mistaken interpretation of the segregation decisions of the Supreme Court to argue that the doctrine of those cases applies only to an entire school system and not to individual schools. The fundamental basis of the decisions is that members of the Negro or minority race are denied the equal protection of the law if they are denied admission to public schools which they are otherwise qualified to attend solely upon grounds of their race. The discrimination is clearly not eliminated by maintaining and operating some schools in the system on a racially segregated basis and others with the discrimination removed.
 'Another objectionable feature of the plan is that it does not offer in any realistic sense an alternative or choice to the members of the minority race. To hold out to them the right to attend schools with members of the white race if the members of that race consent is plainly such a dilution of the right itself as to rob it of meaning or substance. The right of Negroes to attend the public schools without discrimination upon the ground of race cannot be made to depend upon the consent of the members of the majority race.'
 
 
 [13]
 '6. The following will be regarded as some of the valid conditions to support application for transfer:
 'a. When a white student would otherwise be required to attend a school previously serving colored students only;
 'b. When a colored student would otherwise be required to attend a school previously serving white students only;
 'c. When a student would otherwise be required to attend a school where the majority of students in that school or in his or her grade are of a different race.'
 
 
 [14]
 Avery v. Wichita Falls Independent School District, 5 Cir., 1957, 241 F.2d 230, 233, 234
 
 
 [15]
 We intimate no opinion as to the constitutionality of any particular provision of that law, except to say that the law as a whole appears to be constitutional on its face. Compare the Shuttelsworth case, supra