James Jonathan MAPP and Deborah L'Tanya Mapp, minors, by James R. Mapp, their father and next friend

and

Pless Maxey, Jr., a minor, by his mother and next friend, Mrs. Josephine Maxey,

and

Kathy Kirnon, a minor, by her father and next friend, The Reverend H. H. Kirnon, Plaintiffs,

v.

The BOARD OF EDUCATION OF the CITY OF CHATTANOOGA, HAMIL-TON COUNTY, TENNESSEE, a public body corporate,

and

Dean Petersen, Chairman of the Board of Education of the City of Chattanooga,

and

George C. Hudson, Sr., Mrs. J. D. Irvine, William D. Leber, Raymond B. Witt, Jr., Corley R. Young and Gordon Kellett, Members of the Board of Education of the City of Chattanooga,

and

J. W. Letson, Superintendent of Schools of the City of Chattanooga, Tennessee, Defendants.

Civ. A. No. 3564.

United States District Court
E. D. Tennessee, S. D.

March 30, 1962.

Constance Baker Motley, New York City, Avon N. Williams, Jr., Nashville, Tenn., Bruce C. Boynton, Chattanooga, Tenn., for plaintiffs.

Raymond B. Witt, Jr., Ellis Meacham, Chattanooga, Tenn., for defendants.

FRANK W. WILSON, District Judge.

This suit is now before the Court for a decision with regard to the adoption of a plan for the desegregation of the public schools of the City of Chattanooga, Tennessee. Before considering and discussing the various plans of desegregation submitted for consideration by the parties, it is appropriate to review the history of this lawsuit.

This is a civil rights action brought pursuant to the provisions of Title 28 U.S.C.A. § 1343(3), and as authorized by Title 42 U.S.C.A. § 1983. The suit was filed upon April 6, 1960 on behalf of the plaintiffs, who are minor Negro children in the public schools of the City

of Chattanooga, Tennessee, and on behalf of others similarly situated. No question exists as to the jurisdiction of the Court and the suit has heretofore been sustained as a legally sufficient class action. The defendants are the Board of Education of the City of Chattanooga, including the individual members thereof, and the Superintendent of Schools. All necessary and proper parties are before the Court. The relief sought is a permanent injunction enjoining the defendant Board of Education and its members and the Superintendent of Schools from continuing to operate the schools under their jurisdiction on a compulsory biracial basis and ordering the desegregation of the schools in accordance with a plan approved by the Court.

The defendants filed answers upon June 7, 1960, in which certain matters were admitted, including the biracial operation of the city schools, and asserting matters alleged to be in defense to the complaint of the plaintiffs. Among other matters it was the position of the defendants, as stated in their answer, that the School Board, having gone on record shortly after the second decision in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, as fully recognizing their obligation to desegregate the public schools of Chattanooga in accordance with that decision, has at all times since been engaged in a program of elucidation and public education concerning the problems of integration, and that this program not only demonstrated their good faith but constituted appropriate speed and progress toward eventual desegregation.

Upon June 20, 1960, the plaintiffs filed a motion for summary judgment and filed affidavits in support thereof. Shortly thereafter upon July 20, 1960, the defendants filed a motion for summary judgment and affidavits and exhibits in support thereof. Upon this state of the record this Court, Judge Leslie R. Darr presiding, filed an opinion upon October 21, 1960 overruling the defendants' motion for summary judgment, sustaining the plaintiffs' motion for summary judgment and ordering the submission of a desegregation plan by the defendants, it being the opinion of the Court that the program of elucidation did not constitute compliance with the law relating to the desegregation of public schools.

From this order of the Court the defendants took an appeal under 28 U.S. C.A. § 1292, but meanwhile, upon December 20, 1960, the defendants submitted a desegregation plan, hereinafter referred to as the defendants' "First Plan". Upon January 27, 1961, an order was entered by the Court, Judge Leslie R. Darr presiding, tentatively rejecting the First Plan as submitted by the defendants and ordering the defendants to submit a second plan within 60 days. Prior to the submission of the second plan, however, the defendants likewise took an appeal under 28 U.S.C.A. § 1292 from this order of the Court tentatively rejecting the defendants' First Plan of desegregation. Pending the appeals the defendants filed a second plan of desegregation, but further consideration of this was delayed pending the outcome of the two matters upon appeal. Upon November 3, 1961 the United States Court of Appeals for the Sixth Circuit affirmed the judgment of the Trial Court in each case and remanded the case for further proceedings in accordance with the opinion. 295 F.2d 617 (1961).

Following the remand of the case, the plaintiffs filed a proposed alternate plan of desegregation upon December 21, 1961. Upon January 5, 1962 and again upon January 15, 1962 the defendants filed amendments to their First Plan of desegregation. A hearing was held upon February 1 and 2, 1962 upon the various desegregation plans before the Court.

At the time of the hearing the Court in effect had before it three proposed plans for the desegregation of the Chattanooga City Schools. It is appropriate that these plans should be further identified at this point. Without going into a detailed discussion of the provisions of

each plan, it is sufficient at this time to describe the plans as follows:

The Defendants' First Plan of desegregation called for the desegregation of grades one, two and three in schools to be selected by the Board of Education, this initial desegregation to begin in September 1962. The plan did not identify the schools to be desegregated, but called for designation of such selected schools by October 1, 1961. Schools so selected were then to proceed with desegregation at the rate of an additional grade each year. Other schools were to desegregate in accordance with plans to be devised in the future. Among other provisions, the plan called for a further program of elucidation, the eventual establishment of single school zones and the provision for student transfer privileges during the transition period. It was this selective school plan which was tentatively rejected by the Court, the Court's action in this regard being affirmed upon appeal.

The defendants' Second Plan of desegregation may be described as a grade-a-year plan, similar to the plan approved in the case of Kelley v. Board of Education of the City of Nashville, 6 Cir., 270 F.2d 209, certiorari denied 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240.

The defendants' First Plan of desegregation was modified by amendments filed upon January 5, 1962 so as (a) to designate 16 elementary schools as the schools selected for the initial desegregation of grades one, two and three beginning in September 1962, and (b) to provide for the complete desegregation in September 1962 of certain special school programs, principally those relating to handicapped children, and (c) to provide for the desegregation of all elementary schools, grades one through four, beginning September 1963. Provision for desegregation beyond the fourth grade in all schools still remained indefinite under this amendment.

Finally, by a second amendment, filed upon January 15, 1962, the defendants proposed to further modify its First Plan of desegregation so as to provide that desegregation would proceed at a grade a year in all schools beginning with the fifth grade and the third year of the plan. At the request of the Court, the second amendment discussed vocational training courses, but this phase of the plan will be commented upon later, other than to state here that the defendants' plan called for the desegregation of these courses within the grade-a-year framework recommended for all high school courses.

The plaintiffs, upon December 21, 1961, filed a proposed Alternate Plan calling for the establishment of single school zones and the desegregation of all schools beginning with the January 1962 term of school. At the time of the hearing, the plaintiffs' Alternate Plan was modified to provide for the desegregation of all schools effective as of the September 1962 term of school. The plaintiffs' Plan included a provision for the assignment and transfer of teachers, principals and professional personnel without regard to race, but by order previously entered this issue had been removed from the case.

It was upon this state of the record that a hearing was held upon February 1 and 2, 1962. A great deal of the record was stipulated at this hearing in accordance with a pre-trial order. In addition to the record as stipulated the Superintendent of Schools, Dr. Carmichael, testified at length upon behalf of all defendants. The only other witness was Dr. Eugene Weinstein who testified in rebuttal upon behalf of the plaintiffs.

Many of the facts upon which a decision in this case must be based are not disputed in the record. It is undisputed that the City of Chattanooga has, from the beginning of its public education system, operated a racially segregated school system. The schools have historically operated upon the separate but equal principle and continue to so operate to the present time. In this regard it is proper to note that the record would indicate that the school plants and professional competence of the teaching staffs in the white and Negro schools do

appear to be equal. This does therefore in some respects reduce the problems to be encountered in combining the schools into a single system. There are approximately 26,000 students in the system at the present time, of whom 41% or approximately 11,500 are Negro children and 59% or approximately 14,500 are white children. There are 51 schools in the system, housed in 46 school buildings. Of these schools, 34 are elementary schools, 11 are junior high schools and four are high schools. Of the 34 elementary schools 14 are presently all-Negro schools and 20 are presently all-white schools. Of the 11 junior high schools, four are presently all-Negro schools and seven are presently all-white schools. Of the four high schools, one, Howard High School, is a Negro school, and three, Chattanooga High School, Brainerd High School, and Kirkman Vocational High School, are presently white schools. The school system now employs 1,057 teachers, of whom 41%, or approximately 450, are Negro teachers, and 46 principals, of whom approximately 20 are Negro principals.

■ Before considering further the record in this case, it is appropriate to note some of the legal principles which should guide the Court in reaching a decision. Most of these principles were land down in the two Brown decisions. The initial decision, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), established the principle that segregation in public schools solely on the basis of race is a denial of the equal protection clause of the Fourteenth Amendment, and therefore unconstitutional, even though the physical plants and other tangible factors in the racially separate systems may be equal. Immediate implementation of this decision was delayed, however, and the case was restored to the docket for reargument, upon recognition by the Court that "because of the great variety of local conditions, the formulation of decrees in these cases presents problems of considerable complexity."

In the second Brown decision, Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), the United States Supreme Court remanded the cases to the respective District Courts from which they arose, explaining its actions and defining the responsibilities of the District Court and local authorities as follows:

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.

"While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at

the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system. During this period of transition, the courts will retain jurisdiction of these cases."

In view of the admitted continued operation of a biracial school system in Chattanooga contrary to the decision of the Court in the initial Brown case, the Court has heretofore held upon the plaintiffs' motion for summary judgment that an injunction must issue.

██ In accordance with the second Brown case, whether the decree should order immediate and complete desegregation, or provide for some degree of gradualness, depends upon whether the local school authorities carry the burden of establishing that additional time is necessary and in the public interests, and further carry the burden of showing that the additional time requested is not to avoid or delay compliance, but rather is requested in good faith and in furtherance of full compliance at the earliest practicable date. In any event, the decree must order a prompt and reasonable start toward full compliance. It was in this regard that the Court has heretofore held that elucidation, of itself, approximately seven years after the Brown decisions, is not a prompt and reasonable start toward full compliance.

██ In fashioning a decree this Court is therefore charged with a *legal* duty of ordering the elimination of a biracial public school system in Chatta-nooga. At the same time it is charged with the *equitable* duty of accomplishing this with due recognition of both the rights of the plaintiffs and the public interest in accomplishing desegregation in an orderly, expeditious, systematic and effective manner.

From the decisions in the Brown cases, and other judicial interpretations of them, five legal propositions that are pertinent to the issues in this case would seem to be apparent.

██ First, it is apparent that the plaintiffs have a constitutional right not to be excluded from any public school classroom in Chattanooga, Tennessee solely because of their race. This is a present and immediate right, and of equal importance to other rights secured to them and all other citizens under the Constitution. Any delay in extending to them their rights in this regard must be justified only by the most impelling and cogent reasons. The defendants have the burden of showing the necessity or appropriateness of any further delay than has already occurred.

██ Second, it would seem apparent that even though the defendants may have carried the burden of showing that additional time is required, and in the public interest, to accomplish full compliance, the Court cannot fulfil its legal duty if the plan proposed or approved leaves to the discretion of the Board of Education either the schools to eventually be desegregated or the minimum rate of desegregation.

██ A third conclusion that would seem apparent is that any decree, to be legal, must require a prompt and reasonable start toward full compliance.

██ Fourth, it would likewise seem apparent that, upon a showing by the school authorities that time is needed to accomplish desegregation in an orderly, expeditious, systematic and effective manner, the Court would be derelict in performing its equitable functions should it in the face of such proof order full and immediate desegregation.

■ Finally, it is apparent that any plan delaying the full exercise of the plaintiffs' constitutional rights must accomplish full desegregation with all deliberate speed.

Returning again to the legal and equitable duties of the Court, and by way of summary, in order to be legal a decree ordering desegregation must, at the very minimum, provide for a prompt and reasonable start and must accomplish complete elimination of biracially operated schools with all deliberate speed. To be equitable, the decree must also recognize the public interests in having sufficient time to accomplish this in an orderly, systematic, effective, but expeditious manner.

Returning now to the record and testimony in this case, the initial issue to be resolved by the Court is to determine whether the defendants have carried the burden of showing by legally competent evidence that additional time is required to accomplish desegregation in the Chattanooga Public Schools. It is the opinion of the Court that the defendants have carried this burden.

Very extensive testimony has been placed into the record with regard to the activities of the Board of Education and of the school administration in planning for the eventual desegregation of Chattanooga Public Schools. This testimony detailed the activities of the defendants from the time of their announcement in 1955 of their intention of complying with the Brown decisions until the present time. This testimony detailed the extensive activities of the Board and the school administration in preparing the public for desegregation. It recounted the strong public opposition with which it was confronted and the steps taken to overcome this opposition. It recounted the absence of any public leadership in support of its efforts to desegregate schools until recent weeks and months. The testimony indicates that only since September 1961 has any public official or community leadership openly supported the School Board in its efforts to accomplish desegregation. It

further appears from the testimony of Superintendent Carmichael that he has devoted 50% of his time since his employment upon September 1, 1960 to the problems involved in the desegregation of the Chattanooga Public Schools and that his staff is inadequate to meet the administrative problems caused by immediate and total desegregation, but could in his opinion meet these problems in an orderly and effective manner if a more gradual approach is taken. There is testimony in the record that local law enforcement forces, although willing and determined to perform their duty, would be numerically unable to cope with problems raised by total and immediate desegregation, whereas it was believed that they could and would handle the problems incident to a more gradual approach. There was testimony with regard to the problems and time involved in developing proper attitudes upon the part of teachers, proper attitudes upon the part of parents, proper attitudes upon the part of pupils and the problem of persuading people to listen and reason rather than react emotionally. The problems involved in the desegregation of the Chattanooga Public Schools were compared with those facing Louisville, Kentucky, Washington, D. C., and Baltimore, Maryland. Dr. Eugene Weinstein, Associate Professor of Sociology at Vanderbilt University a witness for the plaintiffs, testified that there were major differences between Chattanooga and these cities in regard to this problem. It was pointed out by the witness that Louisville, Washington and Baltimore had had a much longer history of desegregation in hospitals, golf courses, labor unions, medical associations, ministerial associations and other areas than had Chattanooga.

■ Much of the above testimony was objected to by the plaintiffs upon the ground that its only purpose was to demonstrate public opposition to desegration, and public opposition constitutes no legal basis for delay in enforcing constitutional rights. However, it is believed by the Court that the testimony

is competent not only for showing good faith upon the part of the defendants, but also in support of the request for time in accomplishing desegregation. The plaintiffs have cited the case of Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19, in support of their position. This case arose out of the desegregation problems at Little Rock, Arkansas. The Supreme Court held that the District Court had erred in suspending the operation of a desegregation plan for two and a half years in the interest of preservation of public peace and because of public opposition. The case is authority for the proposition that neither actual nor threatened violence or disorders constitute a basis for delaying a prompt and reasonable start toward full compliance. The case is not believed to be authority for the proposition that District Courts are to ignore local conditions and attitudes in forming a decree. Where a prompt and reasonable start is made toward full desegregation, and where it appears that school authorities are acting in good faith to overcome local conditions, including local attitudes toward desegregation, evidence of the manner in which it is proposed to overcome these problems and of the time reasonably required to perform this work is competent upon the issue as to whether the defendants have carried the burden of showing that time should be allowed before ordering complete and total desegregation.

In addition to all of the foregoing, Superintendent Carmichael testified with regard to the financial problems to be encountered in accomplishing desegregation. The operating budget of the Chattanooga city schools for the current year is in the sum of $7,613,000. These funds are derived from Federal, State and County governments, in addition to the City government. In fact, the major part of these funds is derived from the State of Tennessee and Hamilton County. The Superintendent testified that Federal and State funds provide 45% of the operating budget and the County provides 43%, with the City providing only 10–12% of the operating budget. These State and County funds are distributed on the basis of average daily attendance (ADA). Attendance is therefore a vital factor in securing maximum financial support, and the avoidance of absenteeism is a major consideration of good school administration. Careful planning, both as to class size and as to school size, is required in order that the maximum contribution may be received from the State, as these funds are distributed upon an ADA basis of 30 pupils per teacher, with financial support for a non-teaching principal provided only to those schools having a minimum of 15 teachers.

In preparation for the desegregation of the Chattanooga schools it appears that a complete school census was taken in the spring of 1961. Plans for keeping this census current were testified to. The school census of the proposed single school districts are now known for elementary and junior high schools. High schools have never been zoned in Chattanooga and current desegregation plans do not call for such zoning. White students may presently attend either of the three high schools, and enrolment planning is done largely on the basis of tradition and custom.

Considering together the school census and enrolments, and the school financial problems, it is apparent that the problems of anticipating enrolments, absenteeism, and other factors effecting classroom size, total enrolment and ADA can more accurately be anticipated and met under a gradual plan of integration than under a plan of total and immediate desegregation. The financial problems to be encountered by the schools would support a granting of time to desegregate.

From a consideration of all of the testimony and the record in this case, the Court is of the opinion that the defendants have carried the burden of establishing that additional time is needed to accomplish full and complete desegregation of the Chattanooga Public Schools. Furthermore, it is believed by the Court that the record supports a finding that

the defendants' request for time is made in good faith and in contemplation of full compliance.

Turning now to a consideration of the plans for desegregation before the Court, it is obvious from the foregoing that the plaintiffs' Alternate Plan calling for total desegregation of the Chattanooga schools at the beginning of the September term, 1962, can no longer be considered by the Court. There remain two plans submitted by the defendants, the First Plan as amended, calling for the initial desegregation of grades one through three in selected schools, and the Second Plan, calling for a grade-a-year desegregation. The plaintiffs have entered substantially the same objections to both plans. As the defendants are pressing for acceptance of the First Plan as amended, and have entered the Second Plan only in compliance with the Court order that they do so, the Court will at this time consider the provisions of the First Plan. Moreover, such a procedure is proper in recognition that the Court should not substitute its judgment for that of the School Board in areas where the exercise of judgment does not violate some principle of the law. Kelley v. Board of Education of the City of Nashville, 6 Cir., 270 F.2d 209, cert. denied 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240. The initial question to resolve with regard to the First Plan as amended is whether the initial step constitutes a prompt and reasonable start toward full desegregation. It is believed by the Court that it does. The initial step calls for the desegregation at the beginning of the September term, 1962, of grades one through three in 16 elementary schools designated by name in the Plan, with the single school zones as shown upon the single zone map attached to the Plan. As originally submitted the Plan left discretionary with the Board the schools to be selected. This could violate the second legal principle discussed above, and was therefore a factor in the Court's action in tentatively rejecting the First Plan prior to its amendment. However, the amend-

ments have now designated the schools to be initially desegregated. Although some other initial step might be suggested with reason, the Court cannot say that the defendants have acted unreasonably in suggesting as the initial step the selective school approach. On the contrary, it appears from the record that the School Board has given careful consideration to the problem and that there exists good reason for both the selective school approach and for the schools selected. Throughout the testimony the defendants sought to stress their concern for achieving successful initial desegregation, their concern for achieving peaceful desegregation and their concern for maintaining educational quality. Their purposes in this regard and their election to proceed upon a selective school approach as well as their selection of the initial schools is all supported by competent professional opinion and actual school research. It was testified by Superintendent Carmichael that each of the schools selected was done so with care and reason. In meetings with teachers, pupils and parents it was learned or confirmed that the problems of integration were more serious in some areas than others. It does not appear that racial factors have been the decisive factors, as nine of the 16 schools selected for initial desegregation have formerly been white schools and seven have formerly been Negro schools. While it is true that a rather limited number of students will be eligible to attend schools formerly attended only by children of another race, it appears that 31 classes will be integrated and the school administration will be involved in working with approximately 900 parents of children involved in the grades and schools to be integrated. It further appears from the record that there is reason for the selection of grades one through three for the initial desegration, there being evidence that there was less educational difference between Children of the different races in the lower grades, behavior problems are less and the administrative problems of preparing teachers, pupils and parents

are stated to be within the capabilities of the school staff. Since it appears that the Board of Education has valid reasons for both the schools selected and the grades selected as the initial step in desegregation and since the judgment of the Board in this respect does not violate any legal principle, the Court is of the opinion that the judgment of the Board should be accepted and this aspect of the Plan approved.

Likewise with regard to the proposed second step of desegregating grades one through four in all elementary schools at the beginning of the September term, 1963, it appears that valid reason exists for approving this phase of the Plan. This step will constitute the initial desegregation in the remaining 18 elementary schools and some of the problems incident to initial desegregation will reoccur. Any of the reasons justifying the initial step will likewise justify this step.

The defendants' First Plan as amended proposes that additional steps toward full desegregation shall be taken at a grade a year beginning with the third year. Thus it is proposed that the fifth grade will be desegregated in all schools in September 1964, the sixth grade in 1965, and so forth through the twelve grades, with the Plan to be completed in September 1971. The Court is of the opinion however that the record does not justify the time requested for each of the remaining annual steps. As testified by the Superintendent of Schools, the problems to be encountered in these latter years are expected to be less in each subsequent year, with the exception of the initial year of desegregation in junior high school and the initial year of desegregation in high school. This opinion of the Superintendent would appear to be borne out by the facts, for under a grade-a-year plan, an integrated class merely moves from one grade to another. Basically, in later years of the Plan, no additional students are introduced to initial desegregation, except upon the first grade level, and except in the first year of junior high school and the first year of high school. Therefore, except for the first year of desegregation at the junior high school level and the first year of desegregation at the high school level, the grade-a-year plan does not involve the problems of initial integration of students, but only introduces additional teachers to integrated classes. With regard to the first year of junior high school and the first year of high school, it does appear that there will be additional problems encountered, as this will involve the initial integration in many instances of students as well as teachers.

It does not appear therefore that there is justification for two years to accomplish desegregation in the fifth and sixth grades, nor two years to accomplish desegregation in the eighth and ninth grades, nor two years to accomplish desegregation in the eleventh and twelfth grades, but rather that in each instance the two grades should be desegregated in one annual step.

The Court will next direct its attention to the transfer provisions of the defendants' First Plan as amended. There are two sections of the defendants' First Plan, one relating to admission to desegregated schools and the other relating to transfers from desegregated schools, that should properly be considered together. The initial provision, as contained in Paragraph V of the First Plan, is a rather involved statement which says in effect that for the school year beginning in September 1962, students residing within a desegregated school zone who had formerly been attending a different school, may enrol in the desegregated school provided that his parents give consent before a specified time. This provision appears to relate only to the September term, 1962. It appears to relate only to the 16 elementary schools selected for initial desegregation. It speaks of "single zone" schools, but then refers to "schools desegregated by the School Board" as though these were different schools. No school becomes a single zone school until it is desegregated, and then only as to the grades de-

segregated. In short, the provision is not only somewhat confusing, but the Court is unable to understand the reason for any such provision in the Plan. As was recently held in the case of Northcross, et al. v. Board of Education, et al., 6 Cir., 302 F.2d 818, students "cannot be required to apply for that to which they are entitled as a matter of right."

The transfer provision of the defendants' First Plan is contained in Paragraph VI, and provides in effect that students in desegregated schools may transfer upon good cause shown, with good cause being defined to include a situation in which the student is in a numerical racial minority in the desegregated school. The plaintiffs object to this transfer provision of the Plan upon the ground that it is based upon race and when applied could in effect avoid desegregation until all schools are desegregated, if not indefinitely. It is contended by the plaintiffs that such a transfer provision is in violation of the plaintiffs' constitutional rights and in this regard they rely upon the case of Boson v. Rippy, 285 F.2d 43 (C.C.A. 5, 1960), which expressly held such a transfer provision unconstitutional. Upon the other hand, the defendants rely upon the case of Kelley v. Board of Education, 270 F.2d 209 (C.C.A. 6, 1959) certiorari denied 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240 (1959). It does appear that a similar transfer provision was approved by the Court in the Kelley v. Board of Education case. However, the Court in that case held as it did "on the evidence before us." It was further stated that it did not appear in the record that such a transfer plan would be used to evade desegregation. "There is no evidence before us that the transfer plan is an evasive scheme for segregation." In the record of the present case there was evidence by the witness, Dr. Weinstein, that the Nashville transfer plan had operated to minimize progress under the desegregation plan. It does not appear that the availability and use of the Tennessee Pupil Assignment Law (§ 49–1741 et seq., T.C.A.) was considered in the Kelley case. In the *per curiam* opinion denying certiorari in the Kelley case, 361 U.S. 924, 80 S.Ct. 293, it is noted that three justices favored granting certiorari limited to the single issue of the transfer plan approved therein. The case of Boson v. Rippy, supra, is a more recent decision. After discussing the Kelley case it reaches an opposite conclusion. Reason would appear to favor the Boson decision. Not only is the proposed transfer plan of questionable legality, but it is the opinion of the Court that any transfer plan, the express or primary purpose of which is to prevent or delay the adoption or implementation of the plan of desegregation herein developed, should not be approved. The transfer plan proposed by the Board of Education would at the very least greatly delay the implementation of a plan already gradual in its provisions, if not prevent its ever becoming fully adopted. The Court is fully aware that sound educational reasons may exist for permitting or requiring transfer of students upon an individual basis and is further aware that such transfers may have an incidental racial effect upon the composition of any school or classroom. It is not the intention of the Court to disapprove of any transfer or admission plan based upon sound educational reasons merely because some racial consequence may incidentally result therefrom. As heretofore stated in this opinion, it is the purpose of the Court to leave unto the School Board the maximum discretion and responsibility for all phases of the operation of the Chattanooga Public Schools, limited only by constitutional requirements. In the area of admissions and transfers, the Court likewise does not intend to substitute its judgment for that of the Board except to the extent that some legal principle may be violated by policies proposed or adopted by the Board.

▆▆ ▆▆ Therefore the Court holds that the School Board may adopt any admission or transfer plan as in its judgment may be reasonable and proper for the operation of the Chattanooga City

854

Schools, so long as such plan is not based upon race and does not have as its primary purpose the delay or prevention of desegregation in accordance with the Plan herein approved. The Court does expressly disapprove of so much of the defendants' proposed admission plan as would require any student or parent to apply for or consent to implementation of desegregation in accordance with the Plan. The Court further disapproves of so much of the transfer plan proposed by the defendants as permits transfers based only upon students being in a racial minority in any particular school.

A remaining issue for determination relates to the desegregation of vocational training courses. It appears from the record that Howard High School, to which Negro students are presently assigned, is a comprehensive high school, offering a broader range of academic and vocational courses combined than does either one of the three high schools to which white students are assigned. The record does indicate that more vocational courses are offered at Kirkman Vocational High School than at Howard this year at Kirkman as compared with High School, 27 courses being offered 22 vocational courses offered at Howard. However, it further appears that more vocational courses are offered at Howard than are offered at either Brainerd High School or Chattanooga High School. The testimony of Superintendent Carmichael upon this subject was that the vocational training available at Howard, in terms of student need, is at least equal, and may be superior to those offered at Kirkman. It appears that vocational courses are offered at each school as the need and justification therefor is made to appear and Howard is not treated differently in this regard than is Kirkman. It appears that federal financial support for vocational training requires that there be a showing of the need and the justification for each course offered and these are the factors limiting vocational courses offered at Howard as they likewise limit the vocational courses offered at Kirkman. It would appear to the Court therefore that the same reasons which have herein been held to justify delay in the desegregation of academic courses in high school would also justify delay in the desegregation of vocational courses and that Kirkman Vocational High School should be desegregated in accordance with the plan for the desegregation of other high schools.

The School Board also operates the Chattanooga Technical Institute, a post-high school institution offering specialized or advanced technical training. This institute is operated upon a segregated basis. The record is not very clear with regard to the courses offered or the exact position of this institute in the educational system but it is believed that this institute should likewise be desegregated in accordance with the Plan herein approved and as the next annual step following the complete desegregation of the high schools.

The decree will expressly provide that this cause shall be retained within the jurisdiction of the Court and subject to such modification as may from time to time appear just and proper. Either party, upon a showing of just cause, shall have leave to apply for modification, or the Court may upon its own motion and notice to the parties consider modification. The School Board shall report to the Court within 60 days after implementing each annual step of the Plan herein approved as to the progress under the Plan to the date of the respective report. The defendants shall at all times be vested with discretion to proceed with desegregation at an accelerated rate from that provided in this opinion, it being the purpose of the Court to order only the minimum rate of desegregation.

In summary, it would therefore appear from the record that a plan as follows would be justified both as a prompt and reasonable start toward desegregation and as accomplishing full desegregation with all reasonable and deliberate speed.

(1) The desegregation in September of 1962 of the first three grades in 16

selected elementary schools as designated by name in the defendants' First Plan as amended. The following special programs will also be desegregated in September 1962: Class for multiple handicapped; classes for orthopedically handicapped children; authorization for the United Cerebral Palsy Program to be desegregated; classes for perceptually handicapped; classes for severely mentally retarded; class for educable mentally retarded at the G. Russell Brown School.

(2) The desegregation in September of 1963 of the first four grades of all elementary schools.

(3) The desegregation in September of 1964 of the remaining grades in all elementary schools.

(4) The desegregation in September of 1965 of the first year of all junior high schools.

(5) The desegregation in September of 1966 of the remaining grades in all junior high schools.

(6) The desegregation in September of 1967 of the first year in all high schools.

(7) The desegregation in September of 1968 of the remaining grades in all high schools.

(8) The desegregation in September of 1969 of the Chattanooga Technical Institute.

(9) The Board of Education may adopt any admission or transfer plan as may in its judgment be reasonable or proper for the operation of the Chattanooga Public Schools; provided, however, that no admission or transfer plan may be based upon race and have as its primary purpose the delay or prevention of desegregation in accordance with the plan herein approved.

(10) The map of the proposed single school zones as attached to the defendants' First Plan as amended is approved, with the School Board having the right to modify zones from time to time in accordance with their general policies and practices and without regard to purely racial factors.

(11) Within 60 days after implementing each annual step of the plan herein approved the School Board shall report to the Court as to progress under the plan to the date of the respective report. This cause will be retained within the jurisdiction of the Court and this order will be subject to modification from time to time as may appear just and proper.

(12) This order shall provide only for the minimum rate of desegregation and defendants shall at all times be vested with the discretion to proceed with desegregation at an accelerated rate. Except as herein expressly provided the defendants shall not be otherwise restrained by this order.

This opinion will constitute the findings of fact and conclusions of law in this case. A judgment and decree will enter accordingly.