308 F.2d 920
 Doris DILLARD, Vernetta Dillard, Karol L. Williams, Scheryl
Williams, Althea L. Blakey, Sylvia V. Blakey, Phyllis Elaine
Blakey, Phyllis Chapman, Earl Chapman, Cynthia A. Daniels,
Earl Murray, Grace Murray, Gloria Murray, Theresa Murray,
Allegra F. McCullough, Arnita C. Swift and Ellis A. Swift,
infants, by and through their respective parents or
guardians and next friends, Appellants,
v.
The SCHOOL BOARD OF the CITY OF CHARLOTTESVILLE, VIRGINIA,
and Fendall R.Ellis, Division Superintendent of
Schools of the City of
Charlottesville,Virginia, Appellees.
The SCHOOL BOARD OF the CITY OF CHARLOTTESVILLE, VIRGINIA,
and Fendall R.Ellis, Division Superintendent of
Schools of the City of
Charlottesville,Virginia, Appellants,
v.
Carolyn Marie DOBSON, Melvina P. Hamilton, Gloria D.
Hamilton, Rebecca A.Muse, Ruby Yvonne Dickerson,
Betty Ann Swift (Harris) and George W.
King, III, Appellees.
 No. 8638.
 United States Court of Appeals Fourth Circuit.
 Reargued July 9, 1962.
Decided Sept. 17, 1962.
 
 S. W. Tucker, Richmond, Va. (Henry L. Marsh, III, Richmond, Va., Otto L. Tucker, Alexandria, Va., Jack Greenberg and James M. Nabrit, III, New York City, on brief), for appellants, Doris Dillard and others, and appellees Carolyn Marie Dobson and others.
 John S. Battle, Jr., Richmond, Va. (Battle, Neal, Harris, Minor & Williams, Richmond, Va., on brief), for appellees and appellants, The School Bd. of City of Charlottesville, Virginia and another.
 Before SOBELOFF, Chief Judge, and HAYNSWORTH, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en banc.
 PER CURIAM.
 
 
 1
 This appeal was first heard by a panel consisting of Senior Judge Soper, Chief Judge Sobeloff and Circuit Judge Boreman. An opinion was prepared by Judge Soper, but before it was announced by the court a hearing en banc was ordered, in which the five active judges of the court sat, but Judge Soper did not participat.
 
 
 2
 Judge Soper's opinion, which Sobeloff, Boreman and Bell, JJ. adopt as the opinion of the court, is as follows:
 
 
 3
 Cross-appeals again bring to this court questions arising in the administration of the public schools of Charlottesville, Va., with respect to the assignment of white and Negro children in the elementary and high school grades.[1] Our most recent decision in Dodson v. School Board of the City of Charlottesville, 289 F.2d 439 (4th Cir., 1961), outlines the steps that the School Board had then taken toward the integration of the races in the schools and the plan of operation for the school year 1960-1961. The plan involved the division of the City into six geographical districts, each of which was served by one of the elementary schools, to wit: Jefferson, Venable, Johnson, Burnley-Moran Clark and McGuffey. It was provided that each child should attend the school located in the zone of his residence and since a large majority of the Negro residents live in the Jefferson District the result was that, with the exception of some 13 Negro pupils attending the predominantly white Venable School, all of the Negro elementary pupils were enrolled in the Jefferson School, which no white pupils attended. No Negro pupils were assigned to the four other elementary schools. The plan, however, provided that the parents of any child, white or colored, could request a transfer and the superintendent of the schools was emplowered to grant such a request after consideration of various criteria applicable to white and Negro pupils alike, including factors affecting the immediate interests of the pupils and the efficient administration of the schools.
 
 
 4
 Two high schools were operated in the City, Lane and Burley. There were no zones for admission to these schools but the superintendent was guided in making assignments of students by the pupilteacher ratio, convenience of attendance, academic qualifications and, to some degree, by the preference of the pupil and his parents. The transfer provisions were the same as those applicable to the elementary schools.
 
 
 5
 Prior to the plan for desegregation Lane was all-white and Burley all-colored. In 1960-61, at the time the Dodson case was brought, thirteen Negro elementary pupils had been assigned to Venable and seven Negro high school students had been assigned to Lane. That suit was instituted on behalf of four Negro pupils whose application for admission to white elementary schools had been denied because they resided in the Jefferson district and also on behalf of six Negro high school pupils whose application for admission to Lane had been denied, four because of academic deficiency and two because they resided nearer to Burley than to Lane. Having been denied relief in the District Court the plaintiffs appealed to this court. We upheld the Board's plan but condemned the Board's application of the plan as discriminatory and unconstitutional. We pointed out that all Negro elementary pupils were initially assigned to Jefferson whatever the zone of their residence but white pupils living in Jefferson were initially assigned to white schools in other districts. In respect to high schools we showed that all colored pupils were initially assigned to Burley and all white pupils to Lane and that Negro pupils desiring to transfer to Lane were subjected to residence and academic tests which were not applied to white students seeking admission to Lane. We recognized that these practices were discriminatory but, upon the assurance of the Board that they were transitory, we remanded the case to the District Court to re-examine the situation with regard to the ensuing school year, 1961-62, 'confident that steps (would) be taken promptly to end the present discriminatory practices in the administration of the desegregation plan,' 289 F.2d 444.
 
 
 6
 Mindful of this admonition the School Board made certain changes in its plan of operation. The assignment of each elementary school pupil, white or colored, was made to the school in his residence zone. This step, of course, tended to perpetuate the earlier practice of segregation; but transfers were permitted in the following fashion. Elementary pupils, white or colored, assigned to schools where they were in the racial minority were permitted with the consent of their parents to transfer to a school in another district where they would be in the racial majority. Thus a white child living in the Jefferson colored district could transfer to a school in one of the five white districts and a colored chile living in one of the white districts could transfer to Jefferson. To effectuate this plan a form letter was sent by the Superintendent of the schools to the parents of each child attending an elementary school outside the zone of his residence stating that the child had been tentatively reassigned to the same school, but that the child could remain in that school only if the parents specifically requested it. A form to be signed by parents was attached to the letter.
 
 
 7
 Through this procedure all of the white pupils, 149 in number, who lived in the Jefferson area were granted 'transfers' to schools in the other zones and approximately 50 Negro elementary school pupils residing in the white districts were 'transferred' to Jefferson. Nine additional Negro pupils were admitted to the Venable elementary school, bringing the total number in attendance to twenty and nine additional Negro high school pupils were admitted to Lane, bringing the total to sixteen.
 
 
 8
 The School Board reached the conclusion that by adopting this plan they had eliminated all racial discrimination and, accordingly, they rejected the applications for transfer to other districts of seventeen Negro elementary pupils residing in the Jefferson district. On their behalf the present suit was brought in the District Court to restrain the actions of the Board but the District Judge held that the plan was valid and this appeal followed.
 
 
 9
 The question for decision is of special importance in the administration of the Charlottesville schools in view of the Board's past operations and its present attitude in the administration of the achool system. When it is noted that despite prolonged litigation all of the Negro elementary school pupils in the Cirty, other than the twenty assigned to Venable, are still enrolled at the all-Negro Jefferson school, while all of the white students attend one of the five elementary schools in the other districts, and that all of the Negro high school students except sixteen attend the all-Negro Burley High School, it is clear that little change has been made in the administration of the elementary schools from that which prevailed when the schools were completely segregated. It seems equally clear that little progress in the integration of the schools may be expected if the Board is permitted to pursue the policy which, after mature consideration, it has deliberately adopted.
 
 
 10
 The Board's argument is that there is no racial discrimination in the enrollment of the pupils in the elementary schools for the following reasons. The Board has abandoned the plan contained in our decision in the Dodson case. Under that plan Negro pupils wherever they lived were initially assigned to Jefferson and white students were initially assigned to the school of the zone of their residence; and since transfers were only sparingly permitted the admission of colored pupils into white schools was effectually prohibited and segregation was prolonged. Under the new 1961-62 plan, says the Board, every child whether white or Negro is initially assigned to the school of his residence district and transfers are granted to white and colored children under the same rule or restriction. Any child may transfer from a school in which his race is in the minority to a school in which his race is in the majority and since this plan applies to both races alike there is no discrimination.
 
 
 11
 In support of its position the Board relies on Kelley v. Board of Education of the City of Nashville, 270 F.2d 209 (6 Cir. 1959),[2] where it was held that a transfer provision is not invalid which permits voluntary transfers of white and Negro students who would otherwise be required to attend schools previously serving only members of the other race, or where the majority of the students are of the other race. The court thought that this plan was not invalid since the Supreme Court in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), did not deprive persons of the right of choosing the school they desired to attend but merely held that a person may not be denied the right to the school of his choice because of his race. The Sixth Circuit, however, in its subsequent decision in Goss v. Board of Education of the City of Knoxville, Tenn., 301 F.2d 164 (6 Cir. 1962), observed that the application of this transfer provision may become a violation of constitutional rights and consequently admonished the Board not to use it as a means of perpetuating segregation. And see Maxwell v. County Board of Education of Davidson Co., Tenn., 301 F.2d 828 (6 Cir. 1962). Moreover, the Fifth Circuit in Boson v. Rippy, 285 F.2d 43 (5 Cir. 1960), differing from the views set out in the Kelley case, disapproved a desegregation plan which included a transfer provision like that practiced in Charlottesville. It held, 285 F.2d 48, that 'classification according to race for purposes of transfer is hardly less unconstitutional than such classification for purposes of original assignment to a public school.' In Mapp v. School Board of Chattanooga, 203 F.Supp. 843, 853, D.C.E.D.Tenn.1962, the District Court, in accord with Boson v. Rippy, supra, said that 'any transfer plan, the express or primary purpose of which is to prevent or delay the adoption or implementation of the plan of desegregation herein developed, should not be approved.'
 
 
 12
 In our view the Charlottesville plan in respect to the pupils in the elementary schools is clearly invalid despite the defense that the rules for the assignment and transfer of pupils are literally applied to both races alike. It is of no significance that all children, regardless of race, are first assigned to the schools in their residential zone and all are permitted to transfer if the assignment requires the child to attend the school where his race is in the minority, if the purpose and effect of the arrangement is to retard integration and retain the segregation of the races. That this purpose and this effect are inherent in the plan can hardly be denied. The School Board is well aware that most of the Negro pupils in Charlottesville reside in the Jefferson zone and that under the operation of the plan white children resident therein will be transferred as a matter of course to the schools in the other zones while the colored children in the Jefferson zone will be denied this privilege. The seeming equality of the language is delusive, the actual effect of the rule is unequal and discriminatory. It may well be as the evidence in this case indicates that some Negroes as well as whites prefer the schools in which their race predominates; but the wishes of both races can be given effect so far as is practicable not by restricting the right of transfer but by a system which eliminates restrictions on the right, such as has been conspicuously successful in Baltimore and in Louisville.
 
 
 13
 It was suggested during the argument of the appeal that a reversal of the judgment of the District Court might lead the Board to deny all transfers in the Charlottesville schools. We take this occasion to say, however, that such a step might well be as obnoxious as that employed by the Board in the case at bar. A similar plan was condemned in Taylor v. Board of Education of New Rochelle, 294 F.2d 36 (2 Cir. 1961).
 
 
 14
 We do not mean to say that the School Board has no discretion in the assignment of pupils to the Charlottesville schools, but in respect to the elementary children in this case the Board has applied no criteria that would stand the constitutional test and, therefore, in the interest of these children further delay in the exercise of their constitutional rights cannot reasonably be granted.[3]
 
 
 15
 We, therefore, hold that as to the seventeen elementary children, who were plaintiffs in the court below, the judgment be reversed and the case remanded to the District Court so that appropriate steps, by injunction or otherwise, may be taken to secure their admission to the schools of their choice for the 1962-63 school year.
 
 
 16
 The cross-appeal by the School Board in this case relates to the judgment of the District Court that nine Negro high school pupils who were excluded by the Board from the Lane High School be admitted to that institution. Subsequently, the Board admitted two of the nine and as to them the cross-appeal is expressly abandoned in the Board's brief in this court. Four of the remaining seven were before this court in the Dodson case, where we noted that they had been excluded from Lane for academic deficiency and said that residence and academic tests may be properly applied in passing on the applications for admission to a school provided that the factors of race and color are not considered, 239 F.2d 439, 442. Since it was shown that the tests were not applied to white children in the same situation we held that the four plaintiffs had been discriminated against. Nevertheless, we affirmed the judgment below in the confident belief that discrimination between the races in the admission of high school students would be eliminated by the Board itself. In this respect our hopes have been disappointed. The Board has abandoned the residence tests as to high school children but has made no change in the academic tests. The four Negro high school pupils who were before us in the Dodson case, and in addition three other high school students, all of whom are cross-appellees in this case, have been denied admission ot Lane because of alleged academic deficiency. The Board's position is that their admission into a school for which they are not qualified will not only be detrimental to them but to the school itself and, therefore, they should be excluded. Obviously, these factors are worthy of consideration in the operation of any school system. The difficulty is, however, that the Board admits white children to Lane without tests, irrespective of their academic qualification, upon the theory that they should not be denied any high school education whatsoever. The alternative of sending them to Burley is not deemed worthy of consideration. The discrimination involved is too clear to require discussion. Not only are academic tests applied to Negroes only but Negroes who are considered so deficient in academic achievement that their admission to Lane would be detrimental to the school, are sent to Burley without regard to the consequences. See Bush v. Orleans Parish School Board, E.D.La., New Orleans Div., 204 F.Supp. 568.
 
 
 17
 Accordingly, the judgment of the District Court regarding the admission of the nine high school students to the Lane High School will be affirmed and the case will be remanded to that court in order that appropriate steps may be taken to put the judgment into effect.
 
 
 18
 Reversed in part and affirmed in part and remanded for further proceedings. Let the mandate issue immediately.
 
 
 19
 ALBERT V. BRYAN, Circuit Judge, with whom HAYNSWORTH, Circuit Judge, joins (dissenting).
 
 
 20
 Without semblance or hint of gerrymandering-- so conceded by the appellants-- school districts were laid out by the Charlottesville School board for elementary classes in a plan of desegregation which had been filed at the instance of the District Court: each child regardless of race is assigned to the school in the district of his residence. Then, any pupil is allowed-- by merely a telephone call-- to transfer from any school in which his race is not in the majority. Yet this arrangement is now stricken down by the Court because in the operation of the transfer feature as to one school-- Jefferson-- there can be no transfer of a Negro student from that school inasmuch as it is predominantly Negro. This is said to be discrimination. I think the conclusion erroneous both in fact and in law.
 
 
 21
 I. It is not discrimination in fact because the same right of transfer as the white children have at Jefferson is accorded colored children in schools that are mostly 'white'. The same restriction of the Negroes at Jefferson is applied to the white children in the other schools. The Negroes may transfer from the latter-- and 50 of them did-- whereas no white student can leave those schools. It is argued that the white children would would not desire to leave a 'white' school but the Negro would want to leave Jefferson, and thus he is deprived, because of his color, of the 'right' to attend an integrated school. This is to argue, also, that by leaving Jefferson School the white children create segregation there. With equal reason it may be argued that the colored children in departing from the other schools caused segregation there. All of these contentions wrongly ignore three vital considerations: the fairness of the entirety of the plan; the Fourteenth Amendment does not guarantee a student an integrated school to attend; and the 'segregation' here is not the result of plan but of individual choices of individual students.
 
 
 22
 The Negro was not placed at Jefferson because he was a Negro, nor was the white child enrolled at another school because he was white. Neither was so placed in order to keep them apart. They are in their respective schools solely because of the location of their respective residences and for no other reason. The Jefferson residence district, to repeat, was not arbitrarily formed.
 
 
 23
 Approval of the plan of the Charlottesville Board has been declared by this Court. In Dodson v. School Board, 289 F.2d 439 (4 Cir. 1961) we said of it, at p. 442:
 
 
 24
 'At the elementary school level, the plan contemplates that every child, regardless of race, shall be sent initially to the school of the district in which he lives, and after such initial assignments, there may be transfers if the parents so request and the superintendent approves. This is a perfectly acceptable method of making school assignments, as long as the granting of transfers is not done on a racially discriminatory basis or to continue indefinitely an unlawful segregated school system. * * *'
 
 
 25
 The only criticism of the plan there made was the initial assignment of all Negro elementary pupils in the city to Jefferson, rather than to the school of their residence. This was corrected. So that now the only objection urged is that the Negro student does not have freedom to move out of Jefferson when that is the school of his residence.
 
 
 26
 The Sixth Circuit approved an equivalent of the Charlottesville transfer provision in Kelley v. Board of Education of the City of Knoxville, 270 F.2d 209, 228 (6 Cir. 1950) cert. denied 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed. 2d 240, and more recently in Goss v. Board of Education of the City of Knoxville, 301 F.2d 164, 168 (6 Cir. 1962) and Maxwell v. County Board of Education of Davidson Co., Tenn., 301 F.2d 828, 829 (6 Cir. 1962). Contra: Boson v. Rippey, 285 F.2d 43, 47 (5 Cir. 1960); but see Rippy v. Borders, 250 F.2d 690, 693 (5 Cir. 1957) post p. 15. Taylor v. Board of Education, 294 F.2d 36 (2 Cir. 1961) cert. denied 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339, decided by a divided court is not authority to sustain the Court here. There a suburban New York City school district had been deliberately drawn so as to encompass Negro residents only.
 
 
 27
 II. In law there has been no discrimination, for the Negro child has not been denied any privilege through policy, usage, law or regulation. If there has been a deprivation, it is-- solely, actually and not capriciously-- the result of the geographical location of his residence. This is a consideration understandably overlooked by the Court in the generality of its statement that the infrequency of Negro attendance in 'white' schools is itself proof of discrimination.
 
 
 28
 Jefferson School District, as previously noted, was not a discriminatory division. It came about, as often occurs in many cities, through the Negroes' living in a concentrated area. This may change, and thereafter alter the play of the residence and transfer rule at Jefferson. But until then the residents of the area must abide by rules and regulations based on just and fair district lines. No constitutional or legal question is presented. No Government authority has allocated them to a special section of the city or centered their population in a specific territory.
 
 
 29
 The fundamental reason of the Court for holding the refusal of transfer of Negroes to the Jefferson District to be discrimination seems to be that the refusal deprives the Negro children of association with white children, all of whom have transferred from Jefferson District. There is no other grievance suggested in their remaining at Jefferson. The Court further manifests this reason when it says that the residence and transfer provision retards 'integration'.
 
 
 30
 But even if this is the result of the Charlottesville plan-- although entirely incidental-- nevertheless it would not be a violation of the doctrine of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and subsequent commentary decisions. The Supreme Court was explicit there in not requiring integration, but in merely striking down denial of rights through segregation. The point was sharply made in Briggs v. Elliott, 132 F.Supp. 776 (E.D.S.C.1955). It is too late now to question this as the plain holding of that three-judge court. Judge Parker, a member of that panel, confirmed this meaning when he spoke for this Court in School Board of Charlottesville v. Allen, 240 F.2d 59, 62 (4 Cir. 1956) cert. denied 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664, and again in School Board of City of Newport News v. Atkins, 246 F.2d 325, 327 (1957). Substantially this very statement was approved with emphasis by the Fifth Circuit in Ruppy v. Borders, 250 F.2d 690, 693 (1957). Furthermore, on remand of Brown v. Board of Education, the District Court from which it originated, following the rescript of the Supreme Court immediately after its second and implementing school decision, Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), stated the proposition with equal clarity as follows:
 
 
 31
 'Desegregation does not mean that there must be intermingling of the races in all school districts. It means only that they may not be prevented from intermingling or going to school together because of race or color.
 
 
 32
 'If it is a fact, as we understand it is, with respect to Buchanan School that the district is inhabited entirely by colored students, no violation of any constitutional right results because they are compelled to attend the school in the district in which they live.'
 
 
 33
 Brown v. Board of Education of Topeka, 139 F.Supp. 468, 470 (D.Kan.1955). Like decisions in other Circuits are cited in the dissent in the Second Circuit (N.Y.) case of Taylor v. Board of Education, supra, 294 F.2d at 47, n. 4.
 
 
 34
 Our Court's opinion now seems to hold that if a racial minority in a school zone is given a right to transfer out, every member of the racial majority in that school must be given the same right-- otherwise the rule is unconstitutional. Applied to Jefferson School the opinion intimates that the Negro pupils there-- the great majority of the student body-- should be permitted to transfer in the same way as the minority. But the Court denied this very right to the majority in McCoy v. Greensboro Board of Education, 283 F.2d 667 (4 Cir. 1960). There the Board granted the requests of Negro children to enter a 'white' school, then afterwards allowed the transfer of the majority-- all white children-- to another school. The transfer of the majority was held invalid because it left a minority composed of Negroes only. This again was apparently on the thesis that it resulted in a separation of the races whereas the law requires integration-- a theory I find untenable.
 
 
 35
 III. The transfer rule is simply a means of permitting a child to express his wishes. Surely, to allow a child such an option-- even though his wishes be based on racial grounds-- is not unconstitutional. Allowing expression by both races so far as practicable-- with equal opportunity-- of their preferences in a personal matter has not in any degree been precluded by the Supreme Court in its efforts to solve the school problem or in any other field. The Court has merely ruled against enforced separation of persons of different races by reference to objective criteria. Never has the Court denied the exercise of the personal tastes of the races in their associations.
 
 
 36
 The judgment of the District Court in respect to the elementary school appellants should be affirmed. In regard to the high school appellants I express no disagreement with the majority.
 
 
 37
 HAYNSWORTH, Circuit Judge, with whom ALBERT V. BRYAN, Circuit Judge, joins (dissenting).
 
 
 38
 I agree with my brother, BRYAN, that the Board's plan does not merit present condemnation.
 
 
 39
 I am prompted to turn to other considerations, however, for it seems to me the other two opinions are on an esoteric plane far above practical problems confronting school boards. Practical, difficult problems do arise in many places as school boards undertake the task of conversion of school systems to a basis of operation which counters social customs and patterns of conduct, which, over a period of centuries, have become deeply ingrained in a people. The Supreme Court in 1955 recognized that such problems would be encountered and directed that they be not ignored.[1] School boards were allotted the duty of solving and overcoming those problems with all deliberate speed, while the lower federal courts were required to enter appropriate orders when school boards neglect their duty. It is not for the courts, however, by overlooking the practical problems, to impose difficulties in the way of a school board struggling, even though with some reluctanceTo achieve the goal that has been set for it.
 
 
 40
 As I approach the practical situation, in terms of which I think the legal issue here should be framed, I do so with awareness that the case has not been presented on that basis. The question whether discrimination inheres in a geographic assignment plan, if accompanied by a provision for permissive minority transfers, has been tendered in general and abstract terms.[2] The Court answers it in those terms.[3] The School Board has sought affirmance of the District Court's approval of its plan on the basis of its belief that the plan, generally and abstractly, is not discriminatory. It has not asked that it be approved as a reasonable amelioration of a particular problem during a transitional period. That it asked for more, however, does not mean it should get less than its due. If its plan merits temporary approval as a transitional measure, its disapproval should not be unqualified.
 
 
 41
 One may thus concede the reasonableness of the abstract principle declared by the majority and reasonably hold the view that the majority should have proceeded further to consider whether the plan, with its determined defects and shortcomings, might not be permissible as a temporary expedient. If the present record is insufficient for that purpose, it could be supplemented upon remand. At least, the implication that the abstract principle will be applied in other cases, no matter how compelling the reasons for the school board's adoption of a similar plan, ought not to be left open.
 
 
 42
 Those conversant with the problems of desegregation in the South, know the intensity of public concern over the plight of children constituting a small minority unwillingly assigned to a school in which an overwhelming majority is of the other race. If separation of Negro children 'solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone,'[4] such a child may be subjected to a much more searing experience if, bereft of established friends and relations, compelled to attend a school or classes in which all others are of the opposite race. Some children could adjust themselves to such a situation, but in the early stages of desegregation when the force of old customs and practices is unspent, many could not. Those who could not adjust to such a radical change would likely have senses of inferiority greatly intensified, and unadjusted children too frequently become the butt at the hands of their fellows of those unrestrained cruelties of which children of all races are capable. If such unadjustable children are compelled to remain in an intolerable situation, the damage to their emotional and mental development and well-being will be irreparable.
 
 
 43
 It is because of such widespread concern over the plight of unwilling minorities in particular schools that school boards throughout the South have adopted permissive transfer provisions in association with assignment plans bases upon attendance areas or other objective criteria. In some places, such a provision may be essential to the institution or continuance of a plan of desegregation, for it touches an area of peculiar public sensitivity, and school boards cannot operate public school systems without public support.
 
 
 44
 Provisions for permissive minority transfers are founded upon an assumption that the transition to a fully desegregated school system will create personal problems for unwilling minorities in particular schools, especially when the minority is relatively small, which differ in kind and degree from the problems which majorities, especially relatively large majorities, may be expected to encounter. The assumption seems plainly valid, for it hardly is to be doubted that a child well adjusted in School A where his race predominates, where he has established friendships and where he ardently wishes to be, may become very maladjusted if compelled to attend school B where his own race is a small minority, where he has no established friends and where racial differences may become greatly magnified in his own mind. Such a problem is obviously more acute and more difficult to overcome than any personal problem which may be anticipated by members of racial majorities, unseparated from established friends, compelled to accommodate themselves to the presence or absence of a minority of pupils of the other race.
 
 
 45
 Of course, the magnitude of the personal problems and of the difficulties in the way of requisite adjustments will vary with individuals and with differences in environmental conditions. A child who might encounter insurmountable difficulty, as a member of a small minority, in making the personal adjustment, might encounter little difficulty if the minority group was relatively large, 49%, for instance,[5] and included others who were his old friends. Such variances, however, do not militate against the general validity of the assumption that, in the transitional period, unwilling members of minority groups will encounter difficulties and problems which are different in kind and degree from those which members of majority groups may be expected to encounter.
 
 
 46
 This kind of problem exists whatever the race of the minority group. That present provision for permissive minority transfers is in the interest of Negro minorities is suggested by the extent to which they avail themselves of it. This very record discloses that fifty Negro pupils availed themselves of the permissive right to transfer to Jefferson School, rater than attend the predominantly white schools in the attendance areas of which they resided.
 
 
 47
 The majority, of course, does not hold that unwilling minorities may not be allowed to transfer. It does hold that if such transfers are allowed as of course, the same right of transfer must be extended to every other child regardless of the dissimilarities of his circumstances. The provision for minority transfers is treated as a virus which so infects an otherwise objective, nondiscriminatory, lawful, geographic assignment plan, that the plan may not be enforecd as to anyone. Provision for protection of the special interest of minorities is related to malice, which, naked and alone, is not unlawful, but which makes unlawful and actionable a communication which otherwise would be privileged and unactionable.
 
 
 48
 The necessary result of the opinion, therefore, is a stricture on provision for permissive transfers of protesting members of minority groups whenever a school board finds it necessary or desirable to adopt or continue an enforceable geographic assignment plan. The consequence will be that the discretion of school boards is circumscribed, and, in some instances, the effective adoption of any plan may be made impossible.
 
 
 49
 I do not understand the court to say that, in the absence of a blanket provision for the transfer of unwilling members of minority groups, a transfer of one such child, for good reason, would deprive the school board of its power of enforcement of all other assignments. It certainly should not. School boards always have had, and always should have, discretionary power to treat exceptional cases as exceptional. If a school board, having adopted a geographic assignment plan without a minority transfer provision, was confronted with proof that a particular child had previously attended a segregated school attended solely by members of his own race where he worked well and was well adjusted, but, assigned under the plan as one member of a small minority to another school predominantly populated by pupils of the other race, had encountered insurmountable difficulty, that his progress had been arrested and he was suffering great emotional and mental harm, and if such proof was accompanied by the urgent plea of the child and his parents that he be transferred back to the school he formerly attended, must the school board ignore the plea or suffer loss of its power to control all other assignments which it had made under its geographic assignment plan? I would say, obviously not.[6] Every exception to a general rule, if made with good reason, does not invalidate the rule. A permissive transfer of a child whose personal need makes a transfer requisite, should not confer upon all other pupils, who have no comparable need, the same transfer privilege. If tutorial assistance is furnished the child who needs it most, every other pupil, who has no such need, is not denied the equal protection of the laws if he is not offered the same assistance. It would be a gross perversion of constitutional doctrine to say that any governmental body may not reasonable classify citizens and their claims or that a classification based upon the need of the claimants is necessarily unreasonable.
 
 
 50
 If this be so, if a transfer of one child in dire need of it as an exception to an otherwise lawful, geographic assignment plan does not divest the school board of its authority to deny transfers to those who show no such need,[7] a general provision for permissive transfers of the needy class must be permissible if the actual and special need of those to whom it applies reasonably warrants it. The existence of such need and its relationship to the rule, the majority does not consider. The court does not reach the question whether the provision, as an interim measure and as applied here, is reasonable, wise or even essential to progress. It concludes that the provision, however reasonable, in combination with the assignment plan is abstractly discriminatory, and there it stops.
 
 
 51
 If that were the stopping place, no 'stair-step' plan of desegregation would ever have been approved. Such plans are not just abstractly discriminatory; inevitably in application they are concretely so. They are approved, nonetheless, when they represent reasonable progress toward ultimate compliance. Other such interim measures, though claiming no pristine purity free of discrimination's taint, are similarly approved. Indeed that is the very thing the Supreme Court required of us by its remand order in the School Cases. During this transitional period, we have no right to strike down what Charlottesville's School Board has done or to overturn its authority over assignments and transfers, unless, after full consideration, it is found that what it has done is unreasonable in the light of all of the circumstances.[8]
 
 
 52
 Since it seems to me the court has not reached the crucial question and that its abstraction is not decisive of the whole case, I have found it necessary separately to record my disagreement with the result.
 
 
 
 [1]
 The opinion of the District Court is reported at 203 F.Supp. 225
 
 
 [2]
 Certiorari was denied in this case, 361 U.S. 924, 925, 80 S.Ct. 293, 4 L.Ed.2d 240, three justices indicating that they would grant the petition limited to the question whether certain provisions of the Nashville plan were invalid for the reason that they 'explicitly recognized race as an absolute ground for the transfer of students between schools, thereby perpetuating rather than limiting racial discrimination.'
 
 
 [3]
 The operation of the Charlottesville schools was brought to our attention in 1956 in School Board of the City of Charlottesville v. Allen, 240 F.2d 59 Cir. 1956)
 
 
 [1]
 Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083
 
 
 [2]
 The question tendered, in effect, is this: If A and B, one of whom is Caucasian and the other Negro, each of whom is a member of a racial minority in the school to which he is assigned, are both allowed to transfer, is there a denial of the equal protection of the laws to X, if X and Y, a Negro and a Caucasian, each of whom is a member of a racial majority in the school to which he is assigned, are both denied transfers? Since the connundrum elides the fact, or the possibility that it may be the fact, that there was good reason for allowing the transfers of A and B and no comparable reason for allowing the transfer of either X or Y, the resultant discussion, interesting though it may be, is esoteric abstraction
 
 
 [3]
 The majority concentrates attention upon A and X, both of whom had been assigned to the same school. That concentration does not make the resulting discussion concrete, for the opinion does not consider their disparate circumstances or the bearing of those circumstances upon the reasonableness of a general rule allowing the permissive transfer of the one, but not of the other
 The majority also points to the fact that the Board's plan permits actual mixing of the races in the schools at a slower rate than might occur under some other plan, not adopted by the School Board. Such a fact may bear more or less heavily upon the reasonableness of a particular plan under particular circumstances, but, of itself and without regard to other facts bearing upon the reasonableness of the Board's conduct, it is not a final answer. The same thing may be said of every interim arrangement which has met the approval of the courts. Indeed, the same thing may be said of a geographic assignment plan unaccompanied by any provision for permissive minority transfers.
 
 
 [4]
 Brown v. Board of Education, 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873
 
 
 [5]
 Of course, that is not this case
 
 
 [6]
 If a member of a racial majority has comparable need of a transfer, I think a school board could and should transfer him and that its doing so would not deprive it of the power to deny transfers to other members of the majority. Assigned by attendance areas, who have no comparable need
 
 
 [7]
 If this be not so, the conclusion cannot be premised upon anything to be found in the Constitution of the United States
 
 
 [8]
 Of course, this determination is initially for the District Judge, whose findings we can overturn only within the traditional rules limiting our appellate power. Here there is no clear finding on the decisive fact of reasonableness, or unreasonableness for the District Court was of the opinion that the plan was not discriminatory, even abstractly. A remand for further consideration of the crucial question of reasonableness of the rule in the light of the needs and the differences in the needs of members of disproportionate minority and majority groups, might be appropriate. We should not undertake a final decision of that factual question; at least, we should not decide it without consideration of it